Steven A. McLeod, D.C. #924820
Hamilton C.I. (Main Unit)
10650 S.W. 46th St.
Jasper, FL 32052

Chairman Tom Scott
Hillsborough County Commission
County Center
601 E. Kennedy Blvd.
Tampa, FL 33602

Chairman Scott,

    God's grace and peace to you in the name of Jesus Christ, our Lord! This letter is my official request that you petition Governor Jeb Bush, to initiate a special impartial F.D.L.E. investigation to investigate Tampa Police Detective Scott Wolfe, Asst. State Attorney Suzzanne Rossomondo, and several others for criminal charges of tampering with evidence, perjury, and obstruction of justice, in obtaining my criminal conviction and life sentence for sexual battery charges. In this letter, I will provide you with affirmative proof of these allegations against Ms. Rossomondo and Detective Wolfe, as well as, several violations of Tampa Police Department policy by other detectives in the Tampa Police Department Sex Crimes Division.

    This criminal conduct also reaches a Hillsborough County Circuit Court Judge, an Assistant United States Attorney, a Tampa Police Detective, who is deputized into a F.B.I. Task Force, and members of the Hillsborough County Public Defender's Office. Due to the scope of this misconduct, I believe that only the F.D.L.E. or U.S. Department of Justice can adequately and impartially investigate these charges. As County Commission Chairman, you have the authority to petition Governor Bush or to urge State Attorney Mark Ober to do so. I am also sending a copy of this letter to the other six (6) County Commissioners, with the first three exhibits and asking them to individually or collectively request this investigation.

    Please understand that I am not seeking judicial relief from this request for reasons, that I will explain later. I caught the people involved red-handed, tampering with evidence in this

Exh. #8

case and their criminal conduct needs to be investigated. You are well aware that Hillsborough County has a long history of judicial misconduct. The evidence tampering in this case occurred during the time period in late 2000 and early 2001, when the investigation of Judge's Bonanno, Ward, Ficcarrotta and Holloway was ongoing, as well as the Aisenburg affair involving Detective's Blake and Burton of the Hills. County Sheriff's Office.

Over the last few years, investigations have uncovered evidence planting and tampering in the Plant City drug squad, Sarasota Police Department, the Duval County Sheriff's Office in Jacksonville, and recent conviction of four (4) police officers in Miami. The Tampa Police Department is not immune. I made a similar request to new Tampa Mayor Pam Iorio. Mayor Iorio has stated that she intends to be tough on crime, but she obviously intends to ignore the corruption in the Tampa Police Department, as you'll see.

Prior to my arrest, I owned my own business in Tampa called the National Legal Alliance, and I worked as a paralegal for attorney's nationwide. After getting arrested, I became a born again Christian and I believe this evidence tampering occurred in my case because God has given me the ability and boldness to expose this corruption. Jesus Christ said in Matthew 10:26 [NIV] that: "So do not be afraid of them. There is nothing concealed that will not be disclosed, or hidden, that will not be made known."

I realize that this is a lengthy letter with multiple exhibits, but it is important that I fully explain what occurred in this case and more importantly WHY, so please bear with me. I have many family members and friends, who are voters in Hillsborough County and I ask you to take the time to review these documents out of respect for them. Also, if any of your fellow Commissioners request to see all of the exhibits, that you would allow them to see this set. At the conclusion of reviewing this material, I am sure you will be convinced, that I am telling you the truth and will take the appropriate action you believe necessary.

I will start by explaining the sexual battery allegations made against me and be prepared because the details are not pretty. I lived in a three bedroom house at 8101 N. Dakota

Avenue and I operated my business out of my home. For the past several years, I have been a recovering alcoholic and drug addict, involved in Alcoholics Anonymous, which is how I met the alleged victim in this case, Ms. Jeanneau, back in 1992. She and I engaged in casual sex over the years since we met. In early September of 2000, I had evicted my roommate, and Ms. Jeanneau was living in a women's recovery halfway house, and was suppose to have Multiple Sclerosis. She contacted me and ended up renting a room in my house.

Ms. Jeanneau moved in my house on Sept. 14th 2000, a few days before Hurricane Gordon passed by Tampa off the West Coast of Florida. She was suppose to pay $300 per month for rent, and the agreement was that she would pay $150 every two weeks because she got paid bi-weekly. When she moved into my house on Sept. 14th, 2000, she only paid $75.00, which caused some friction between us. On Saturday morning, Sept. 16th, 2000, Hurricane Gordon was closing in on Tampa, and I had Ms. Jeanneau take me to the grocery store to buy hurricane supplies. One of the things that I purchased was a clothesline to tie things down in the backyard during the storm if necessary, but I never used it.

This brings us to the early morning hours of Sept. 20th, 2000, when the sexual battery was alleged to have occurred. Ms. Jeanneau said that I woke her up at about 12:30 a.m. and placed something cold against her back, claiming it was a knife. She stated that her nightgown and panties were stripped off in her bed, and that she was tied each ankle to each wrist on both sides and forced to crawl into my office. While still tied, she stated that she was forced to perform oral sex on me while she watched herself on the computer monitor, but that she was almost blind without her contact lenses which she wasn't wearing.

She stated that she was forced to crawl tied to the living room and get on the white couch, where she was untied, and forced to penetrate herself anally with an object, while performing oral sex on me. She stated that she told me she was going to have diarrhea on the couch and so I untied her. She said she had an episode of diarrhea on the couch, down the hallway, and all over the bathroom. She claimed that I harshly forced her to clean up

3

the bathroom and that she took two showers because she felt so dirty, and then was forced to come into my bathroom and perform oral sex on me again. It should be noted that she was on her menstrual period at the time.

The victim stated she got up the next morning and told me she had to go to work and left at about 9:30 a.m., and that I told her to come straight home from work. She went to an A.A. club at the end of my street called Sobrenity for a little while to find someone to talk to and couldn't so she left and went to the halfway house she previously lived in and had a friend call police. Officer Warren from the T.P.D. responded and took statement while awaiting on Detective Wolfe, who is a 19 year police veteran and with the T.P.D. Sex Crimes Division.

Detective Wolfe had two (2) patrol officers respond to my house and wait with me until he arrived and I was placed under arrest at 12:30 p.m. (Exh. #12). Detective John Yaratch, a 19 year officer with T.P.D., who was a detective in the T.P.D. Sex Crimes Division, responded to my house and Detective Jay Dickie, who has been a detective with the Sex Crimes Division for seven (7) years and with T.P.D. for seventeen (17) years, was contacted to get a search warrant for my home. Det Wolfe also contacted Evidence Technician Edwin Rojas, (19 years with T.P.D.) to collect evidence and Detective Sheehan, a T.P.D. Detective deputized into an F.B.I. Task Force investigating computer crimes to respond to assist in the search of my computer.

Detective Wolfe later testified that he was present in my office when the clothesline or rope was found in the bottom left hand drawer of my desk. (Exh. #6, Pg. 53 lns. 5-7). This desk is where the computer was located that the alleged victim said she watched herself perform oral sex on me. Det Wolfe had Evid. Tech. Rojas take two (2) pictures of this rope while it was still in the drawer and these pictures are Exhibits 1 & 2. Look at these two photos <u>VERY</u> carefully because this rope was the evidence that was tampered with and these photos will prove it. Evid. Tech. Rojas then placed the rope in an evidence bag, sealed it, and checked it into the T.P.D. property room.

4

On February 6th, 2001, the morning of my trial, the evidence bag with the rope in it was brought into the courtroom already opened. The evidence bag was held open when Ms. Jeanneau testified and she stated it appeared to be the rope used. The evidence bag was shown to Evid. Tech. Rojas, who testified that his initials were on the seal and indicated that he had taken it into evidence. Only one of the photos (Exh.#2) was entered into evidence at my trial. Asst. State Attorney Suzzanne Rossomondo asked Det. Wolfe during his trial testimony if the rope in the bag was in the same condition as when he found it, (Exh.#11, Lines 9-13) but the rope was never taken out of the bag and I'll explain why in a moment.

During the closing argument of my trial, my trial attorney, Asst. Public Defender Ursula Richardson, conveniently pulled the rope out of the bag and told the jury it was "lily white" (Exh.#16, Pg.2, lns. 1-2). Ms. Richardson told the jury that I had a dog in my house, terrazzo floors (See Exh.#3) and carpet in the office, but that the rope was brand new and there wasn't a speck of dirt, dog hair, carpet fiber or feces on it.

During her portion of closing argument, Ms. Rossomondo picks up the rope by some knots and loops in it and says: "Look at the way it is tied, look at the way it was found put together in the drawer, and found by the detective." (Exh.#4, lns. 16-18) Later Ms. Rossomondo tells the jury: "And what a coincidence that they found it in the computer room where she was tied up. And what a coincidence that the rope is tied where you can be locking someone's hands and legs together. What a coincidence." (Exh.#5, Lines 4-8).

The problem, Chairman Scott, is that if you look carefully at the crime scene photos of the rope (Exh.#1+2) taken by Evid. Tech. Rojas when he took the rope into evidence, THERE ARE NO KNOTS OR LOOPS IN IT! This rope is coiled exactly as it came off the machine at the factory and even has the bends still in it from where it was doubled over in the bag. It obviously

5

has never been uncoiled since leaving the factory so it couldn't possibly have been used to tie someone up with for several hours. These photos aren't the best quality, but T.P.D. or the State Attorney's Office will supply high quality color photos if you wish to see them.

Someone tied those knots and loops in this rope and as I'll show you, the only people who had access to it were Detective Wolfe and Asst. State Attorney Suzzanne Rossomondo. They opened the evidence bag containing the rope the morning of my trial in Ms. Rossomondo's office. One of them tampered with it, both of them had knowledge of it, and I caught them red-handed!

The reason why this rope was tampered with at trial was because Ms. Jeanneau had some credibility problems. Seeing herself on my computer was impossible because the computer was not capable of having a camera hooked up to it. She also said she was on her period, was stripped naked in her bed, but when she had diarrhea while on the white couch that she saw some of it fall on her panties, which was impossible if her panties were removed in the bedroom. She further said that she took two showers because she felt dirty, but after all this she was still wearing the same panties the next day when she went to the rape examiner and they were taken from her. I'm sure you would find such a story difficult to believe.

Also, during her deposition she had been adamant that we only had sex one time several years ago. During trial she reiterated this statement on direct examination by Ms. Rossomondo and again on cross-examination. Much to Ms. Rossomondo's dismay when she tried to reinforce this testimony during re-direct examination, Ms. Jeanneau changed her testimony and admitted that we had sex on several occasions with the last time being eighteen (18) months before this incident. I was also charged with sexual battery with a knife, but at trial, for the first time, Ms. Jeanneau testified that it could have been a knife or it could have been a gun. Obviously, the jury didn't buy this because I was found guilty of sexual battery

6

without a weapon. The point is that my conviction would not have been obtained without the tampering with the evidence.

I raised the evidence tampering issue in my Motion For New Trial after firing Ms. Richardson as my attorney. The entire transcript of this proceeding is attached as Exhibit #6. With this transcript I can prove the evidence tampering and several other problems that need to be investigated. Detective Wolfe testified that he the knots and loops in the rope when he opened the evidence bag in Ms. Rossomondo's office the morning of my trial to measure the rope. (Exh. #6, Pg. 60). This brings up an interesting question of if Ms. Rossomondo knew before trial that the knots and loops were in the rope and the alleged victim had substantial credibility problems, why not take the rope out during the evidence portion of the trial and show it to the jury? The obvious answer is because the photo of the rope (Exh. #1) is sitting on the prosecution table showing that there were no knots and loops in the rope and she didn't want any witnesses cross-examined on this issue or the photo scrutinized too closely.

Chairman Scott, I believe it is now time to explain to you why I'm not seeking judicial relief by my request for an F.D.L.E. investigation. I am a Christian and I have a responsibility as a servant of Jesus Christ to tell the truth no matter how ugly it is. The truth is that the reason I know this rope was tampered with is because Ms. Jeanneau was tied up but the rope entered at trial <u>was not</u> the rope used. I had cut two (2) three-foot pieces off the rope and used it to tie her. Look in the upper right hand corner of the photo and you will see the two ends of the rope that are burnt with a lighter to stop the nylon from fraying after it was cut. Det. Wolfe and Ms. Rossomondo realized this when they took the rope out of the evidence bag and it was six (6) feet too short. They realized that I had disposed of the rope I used so they tied the knots and loops in the rope they found, which was brand new.

For the past several years, I was involved in a fantasy dominant/submissive bondage subculture. I'm unsure if you

7

are aware or not but there is a large such subculture like this in Ybor City. Ms. Jeanneau changed her trial testimony at my trial concerning how many other times we had sex because she was afraid that other people would be called as witnesses to testify about the type of sexual conduct we were involved in. Ms. Jeanneau could "remember" having sex with me one time nine (9) years before this but was trying to hide the other 4 or 5 times since then. She was loosely bound for about 45 minutes and not for several hours like she said. This is why there were no marks on her wrists or ankles. This is not pretty but it's the truth and it's how I know the rope was tampered with.

 People who are convicted of sex crimes are considered the lowest form of life on earth and as a Christian now, I cannot stand silent and let Det. Wolfe and Ms. Rossomondo think they can frame people just because they believe that they are guilty. Innocent people will go to prison by them playing God, judge, and jury. I caught them and I'm sure I'm not the first person they have done this to. I'm not going to keep my pride and let innocent people be sent to prison. The sexual behavior I was involved in was wrong and God has dealt with me severely for it. I'm telling you the truth, Chairman Scott, and you have a responsibility to protect the people you serve.

 You must also realize that as a college educated paralegal with several years experience working in criminal law, I'm not dumb enough to leave that rope in the desk drawer, next to the computer. When I was arrested, the piece of rope found was actually sitting on the windowsill in the kitchen still in the package. I knew exactly where it was because when the two uniformed police officers arrived at my house, they made me put my dog in the backyard. (Exh. #6, Pg. 32). The door to the backyard was in the kitchen and when I put the dog out the rope was sitting in the window.

 It took me a while to figure out how the rope got in the desk drawer, but I can prove that Detective Wolfe, Detective Yaratch and Detective Sheehan, the F.B.I. computer

8

expert, were all involved. Detective Wolfe testified in the new trial hearing that Det. Yaratch and Det. Sheehan, were standing there when the drawer was opened. (Exh. #6, Pg. 53, lns. 11-14). Det. Wolfe said in his police report dated 9/20/00, (Exh. #8, Pg. 2) that the search warrant was read out loud after being received by Det. Dickie. Det. Dickie testified that the search did not begin until she arrived with the warrant (Exh. #6, Pg. 26, lns. 12-14) which is untrue because the rope was found <u>before</u> she got there.

    Detective's Wolfe, Yaratch, and Sheehan were in the house before the warrant got there and Detective Wolfe lied in his report. Det. Yaratch testified that he was at my house with Det. Wolfe and Det. Sheehan showed up and then Det. Dickie eventually showed up as he was leaving. (Exh. #6, Pg. 22, lns. 14-17). Det. Yaratch testified he walked through the house and went into my bedroom and Ms. Jeanneau's. (Exh. #6, Pg. 22, lns. 7-11) Officer Warren testified when he arrived at the house with the victim, there were officers <u>inside</u> and outside the house. (Exh. #6, Pg. 26, lns. 7-18). Det. Dickie testified the victim was there when she arrived (Exh. #6, Pg. 25, lns. 6-9) and that the search did not begin until she arrived with the warrant. (Exh. #6, Pg. 26, lns. 7-18). Obviously, if there were officers in the house when Officer Warren arrived with Ms. Jeanneau and they were there when Detective Dickie arrived with the warrant, then the Detectives were in the house before the warrant arrived. This coincides with Detective Yaratch leaving when Det. Dickie arrived and Det. Yaratch testified he had already walked through the house. This is called perjury.

    If you will notice, I asked Det. Wolfe what he did when he opened the drawer and he said, "he closed the drawer." (Exh. #6, Pg. 53, lines 16-18). This did not make sense that he would close the drawer, but I believe he closed the drawer when he put the rope <u>IN</u> the drawer. Also, you will notice that several officers were in the house, but few admitted to searching anything. There were several other violations of T.P.D. policy during the search such as allowing Ms. Jeanneau to remove her belongings while the search was going on. (Exh. #6, Pg. 30, lns. 3-8) and not

9

Another violation of T.P.D. policy was Det. Wolfe's failure to take the white couch cushions into evidence when he said they had feces stains on them. The victim said she had diarrhea on the couch and Det. Wolfe said he saw stains consistent with feces on them but he didn't take the cushions into evidence. (Exh. #14, Pg. 218, lns. 10-2). The victim told the rape examiner she was possibly penetrated anally by my penis (Exh. #7). Det. Wolfe testified he told Evid. Tech. Rojas to take pictures of the couch cushions (Exh. #14, Pg. 218, lns. 10-16) but Evid. Tech. Rojas denied this. (Exh. #13, Pgs. 195-196).

Tampa Police Department policy requires that any items containing bodily fluids in the location of a sexual battery be taken into evidence for possible D.N.A. testing. All we had was Det. Wolfe's word, which was perjury, because there was no stains on the WHITE couch cushion. If there were stains on the couch cushion, he would have taken it into evidence. Det. Wolfe may be a liar but he is not that incompetent. Exhibit #3 is the photo that Det. Wolfe told Evid. Tech. Rojas to take and it's of the back of the couch. There was no D.N.A. evidence in this case.

Detective Wolfe committed perjury on several occasions, but at least one other time I can prove it. At deposition, Det. Wolfe was asked if he found any knives in the house at all and he responded "No." (Exh. #10, lines 1-7). At trial, Det. Wolfe testified that he found so many knives, he couldn't take pictures of them all. (Exh. #9, lines 13-23) His testimony at trial was a lie. The alleged victim moved in my house on Sept. 14th, 2000, and my prior roommate had moved out the previous weekend taking the knife set from the kitchen. The only knives in the house were four (4) butter knives and one (1) steak knife in the kitchen and one razor knife/boxcutter in the top desk drawer.

You should also realize that Ms. Rossomondo was very brazen about what she did. I was prosecuted in 1988 on a kidnapping case in Hillsborough County by James Muench, who now is a Assistant United States Attorney in Tampa. Ms. Rossomondo

10

had Mr. Muench attend my sentencing and he sat in the front row aisle seat of the courtroom. Ms. Rossomondo took Det. Wolfe over and introduced Det. Wolfe to Mr. Muench as "the detective who tied the knots and loops in the rope." This introduction was heard by Niki Eakins (Exh. #15), it was partially by my sister, who was sitting behind Mr. Muench, and by two ladies sitting across the aisle from Mr. Muench, who were in the courtroom for the sentencing of another man named Adam Hutchinson. Mr. Muench heard the statements I made during sentencing concerning the evidence tampering but failed to report what Ms. Rossomondo to anyone.

Chairman Scott, I believe all of this happened in my case because of a common practice in Hillsborough County judicial system called "stamp trading." This practice is when a prosecutor and a defense attorney, usually a Public Defender, decide before court what the outcome is going to be. The defense attorney will agree to "lay down" or not to put on a defense, in trade for a favor in another case from the prosecutor. These "trades" are routinely done in the courtroom hallways, over the phone, over lunch and usually with the judges' knowledge. What is done in the courtroom, even during trials, is pre-determined by the prosecutor, defense counsel and if the judge doesn't know in advance, they look the other way. THIS IS NOT JUSTICE!!!

Let me show you a very good example of "laying down" by a defense attorney. Ms. Richardson, my trial attorney, told the jury early in her opening argument how the jury would hear about an incident at my house on Dakota Avenue, near Gandy and Manhattan, (Exh. #17, Pg. 124, lns. 4-5). She then goes on to tell the jury she believes the evidence will show that Ms. Jeanneau crawled into bed with me on the night of the Hurricane and performed oral sex on me. (Exh. #17, Pg. 124, lines 9-22).

My house was located at 8101 N. Dakota Avenue, which is one (1) block south of Waters Avenue between Florida Avenue and Armenia Avenue and that is some thirteen (13) miles from the

11

intersection of Gandy Avenue and Manhattan Blvd. This incident occurred during the early morning hours of September 20th, 2000. I have obtained a hurricane longitude/latitude tracking map of Hurricane Gordon from the National Weather Service in Ruskin, which shows that at 0000 hours of September 20th, Hurricane Gordon was at 40.0 N latitude and longitude 74.0 W (Exh. #18, Pg. 1). If you put these coordinates on the Hurricane tracking chart on September 20th, 2000, (Exh. #18, Pg. 2) you will see that Hurricane Gordon was located off the coast of <u>ATLANTIC CITY NEW JERSEY</u>. (It passed off the coast of Tampa on Saturday, September 16th, 2000). Mr. Richardson missed the location of the house by 13 miles and the time of the alleged offense by <u>FOUR (4) days</u>. THAT is laying down.

 At the time of my trial, Ms. Rossomondo, had transferred to another courtroom to work as a prosecutor and my case was the only case she kept in Judge Espinosa's courtroom. My trial attorney, Asst. Public Defender Ursula Richardson is now Asst. State Attorney Ursula Richardson and is prosecuting cases in the same courtroom I was convicted in. I believe that an investigation will prove that Ms. Richardson "traded" me with Ms. Rossomondo and that Judge Espinosa had knowledge of it. No attorney could be this incompetent and Hillsborough County has a long history of bribery and corruption by judges and prosecutors. I have knowledge of the "trading" practice from my experience as a paralegal and working in the offices of attorney's involved in it.

 I sent an identical request for an investigation to Tampa Mayor Iorio, (Exh. #19). My request to Mayor Iorio was for an impartial F.D.L.E. investigation because I did not believe the Tampa Police Department could adequately investigate this due to the scope of the people involved. What did Mayor Iorio do? She sent the request to Tampa

Police Department Internal Affairs. Captain Marks responded that this was the third time she had responded to complaints by me and others concerning this case. (Exh. #20). My request was for an F.D.L.E. investigation because myself and friends had complained to T.P.D. Internal Affairs and they did nothing.

This brings up another interesting point, due to information I obtained from the personnel files of the detectives involved. I filed a Public Records Request pursuant to Fl. Stat. 119.07 for a list of all the complaints filed against Detective's Wolfe, Yaratch, Dickie and Sheehan, and I received the documents from T.P.D. (Exh. #21). Detective Wolfe had only two but none of them involved my case. Obviously, they never investigated the complaints in my case, which leaves the question of how many other complaints were made against Detective Wolfe like mine that weren't investigated?

As you can see I have the requisite proof to warrant an investigation. In 1989, one of the county commissioners raised concerns with State Attorney Bill James over very questionable prosecution tactics in obtaining my conviction in that case. One reason that I am not seeking judicial relief in this investigation request to you is because I have post-conviction motions currently pending in court. I have a Motion To Disqualify State Attorney's Office of The Thirteenth Judicial Circuit set for a hearing before Judge Espinosa on January 8th, 2004, due to Ms. Richardson's transition from Public Defender to Assistant State Attorney, along with the prosecutorial misconduct in this case.

I can handle the litigation in the judicial arena and I am requesting the investigation because of the criminal conduct of planting of evidence, tampering with

12

evidence, perjury, and obstruction of justice. Obviously, Tampa Mayor Pam Iorio and State Attorney Mark Ober have a stake in keeping an investigation from occurring. I don't believe that Mark Ober condones such behavior or was involved in this because he had only taken office about 3 weeks before my trial.

I am not just making unsubstantiated allegations because the documents and crime scene photos provide a strong circumstantial case of criminal conduct. I believe the only agency capable of impartially investigating these allegations is the F.D.L.E., and I'm requesting that you and the other County Commissioners petition Governor Bush to initiate such an investigation. I have proof of what I'm saying, I have told the truth and if there was no wrongdoing, then an investigation would be welcomed by the people involved. I am requesting your assistance and I trust in God that the truth will come out. Thank you and God bless.

IN Christ,

DATED: 12/10/03

Steven A. McLeod

cc: With Exhibits 1-3 only
County Commissioner Ken Hagan
County Commissioner Jan Platt
County Commissioner Kathy Castor
County Commissioner Jim Norman
County Commissioner Pat Frank
County Commissioner Ronda Storms
State Attorney Mark Ober
Tampa Mayor Pam Iorio
Lawrence Fletcher - Tampa Tribune
file

14

# EXHIBITS

Exh. #
- #1 - Crime Scene Photo of Rope
- #2 - Crime Scene Photo of Rope
- #3 - Crime Scene Photo of Back of Couch
- #4 - Trial Transcript Excerpt - Pg. 273 - Closing Argument - Ms. Rassomondo
- #5 - Trial Transcript Excerpt - Pg. 280 - Closing Argument - Ms. Rassomondo
- #6 - Motion For New Trial Transcript on March 16th, 2001
- #7 - Sexual Battery Exam Report by ARNP Shirley Engle
- #8 - Tampa Police Report Dated 9/20/00 by Detective Wolfe
- #9 - Excerpt of Trial Testimony by Detective Scott Wolfe - Pg. 210
- #10 - Excerpt of Deposition Testimony by Detective Wolfe
- #11 - Excerpt of Trial Testimony by Detective Wolfe
- #12 - Hills. Co. Sheriff's Office - Booking Report
- #13 - Trial Transcript Excerpt of Evid. Tech. Edwin Rojas, Pgs. 195-96
- #14 - Trial Transcript Excerpt of Det. Scott Wolfe, Pgs. 213-218
- #15 - Affidavit of Nicola Eakins dated April 3rd, 2001
- #16 - Excerpt of Opening Argument by Ursula Richardson, Pgs. 266-7
- #17 - Excerpt of Closing Argument by Ursula Richardson, Pg. 124
- #18 - Hurricane Tracking Information from National Weather Service
- #19 - Letter to Tampa Mayor Pam Iorio dated May 21st, 2003
- #20 - Letter from Internal Affairs Captain Jill Marks - T.P.D.
- #21 - Personnel Records of Detectives Dickie, Wolfe, Yaratch, Sheehan



