Steven A. McLeod, # 924820
Hamilton C. I. (Main Unit)
10650 S.W. 46th Street
Jasper, Fla. 32052

Mayor Pam Iorio
Tampa City Hall
300 E. Kennedy Blvd.
Tampa, Fla. 33602

Mayor Iorio,

    God's grace and peace to you, in the name of Jesus Christ, our Lord. This letter is my official request that you petition Governor Jeb Bush, to initiate a special, impartial F.D.L.E. investigation, to investigate Tampa Police Detective Scott Wolfe, Assistant State Attorney Suzzanne Rossomondo, and several others for criminal charges of tampering with evidence, perjury, and obstruction of justice, in obtaining my criminal conviction and life sentence for sexual battery charges. In this letter, I will provide you with affirmative proff of these allegations against Ms. Rossomondo, and Detective Wolfe, as well as several violations of Tampa Police Department policy by other detectives in the Tampa Police Department Sex Crimes Division.

    This criminal conduct also reaches a Hillsborough County Circuit Court Judge, an Assistant United States Attorney, a Tampa Police Detective who is Deputized in a F.B.I. Task Force, and members of the Hillsborough County Public Defender's Office. Due to the scope of this misconduct, I do not believe that the Tampa Police Department can adequately and impartially investigate these charges. As Mayor of Tampa, the Tampa Police Department falls under your authority and you have a responsibility to have police misconduct investigated.

    Please understand that I am not seeking judicial relief from this request for reasons that I will explain later. I caught the people involved in this misconduct red-handed, tampering with evidence in this case and their criminal conduct needs to be investigated. I realize that you just took over as Mayor of Tampa, but you are aware that Hillsborough County has a long history of judicial and governmental corruption.

    The evidence tampering in this case occurred during the time period in late 2000 and early 2001, during the investigation of Judge's Bonanno, Ward, Ficcarrotta, and Holloway, as well as during the Aisenburg affair,

Exhibit #5

involving Detectives Blake and Burton, of the Hills. Co. Sheriff's Office. Over the last few years, investigations have uncovered evidence planting and tampering in the Plant City drug squad, Sarasota Police Dept., the Duval County Sheriffs Office in Jacksonville, and the recent conviction of four (4) police officers in Miami. The Tampa Police Dept. is not immune. I am reguesting that you make a stand early in your tenure in office, like several other mayors have, such as Rudy Guillani in New York City, to clean up police corruption.

Prior to my arrest, I owned my own business in Tampa called the National Legal Alliance, and I worked as a paralegal for attorney's nationwide. After getting arrested, I became a born again Christian and I believe that this evidence tampering occurred in my case because God has given me the ability, and boldness to expose this corruption. Jesus Christ said in Matthew 10:26 [NIV] that; "So do not be afraid of them. There is nothing concealed that will not be disclosed, or hidden, that will not be made known."

I realize that this is a lengthy letter with several exhibits attached but it is important that I fully explain what occurred in this case, and more importantly **WHY** it happened, so please bear with me. After reading through this material, you will have to make a choice. You can either request for Governor Bush to initiate an F.D.L.E. investigation as was done in the Aisenburg case, or you can ignore these allegations and suffer the consequences when the truth eventually comes out. You can either be known for fighting corruption, or approving of it, by your inaction. I'm asking you to do the right thing and I can provide the evidence to support your decision.

I will start by explaining the sexual battery allegations made against me, and be prepared because the details are not pretty. I lived in a three bedroom house at 8101 N. Dakota Ave., and I operated my business out of my home. For the past several years, I have been a recovering alcoholic and drug addict, involved in Alcoholics Anonymous, which is how I met the alleged victim in this case, Ms. Jeanneau, back in 1992. She and I had engaged in casual sex over the years since we met. In early September of 2000, I had evicted my roommate, and Ms. Jeanneau was living in a woman's recovery halfway house, and was supposed to have had Multiple Sclerosis. She contacted me, and ended up renting a room in my house.

Ms. Jeanneau moved in my house on September 14th, 2000, a few days before Hurricane Gordon passed by Tampa off the West Coast of Florida. She was supposed to pay $300 per month for rent, and the agreement was that she would pay $150, every two weeks, because she got paid bi-weekly. When she moved into my house on September 14th, 2000,

she only paid $75.00, which caused some friction between us. On Saturday morning, September 16th, 2000, Hurricane Gordon was closing in on Tampa, and I had Ms. Jeanneau take me to the grocery store to buy hurricane supplies. One of the things that I purchased was a clothesline to tie things down with in the backyard, if necessary during the storm, but I never used it.

This brings us to the early morning hours of September 20th, 2000, when the sexual battery was alleged to have occurred. The alleged victim, Ms. Jeanneau, said that I woke her up at about 12:30 a.m., and placed something cold against her back, claiming it was a knife. She stated that her nightgown and panties were stripped off in her bed, and that she was tied each ankle, to each wrist, on both sides, and forced to crawl into my office. While still tied, she stated that she was forced to perform oral sex on me, while she watched herself on the computer monitor, but that she was almost blind without her contact lenses which she wasn't wearing.

She stated that she was forced to crawl tied to the living room, and get on the white couch, where she was untied, and forced to penetrate herself anally with an object, while performing oral sex on me. She stated that she told me she was going to have diarrhea and so I untied her, and that she had an episode of diarrhea on the couch, down the hallway, and all over the bathroom. She claimed that I harshly forced her to clean up the bathroom, and that she took two showers because she felt so dirty, and then was forced to come into my bedroom and perform oral sex on me again. It should be noted that she was on her menstrual period at the time.

The victim stated that she got up the next morning, and told me that she had to go to work and left at about 9:30 a.m., and that I told her to come straight home from work. She went to an A.A. Club at the end of my street, called Sobrenity for a little while to find someone to talk to, and couldn't, so she left and went to the halfway house she previously lived in, and had a friend call the police. Officer Warren from the T.P.D. responded and took her statement while awaiting on Detective Wolfe, who is a 19 year veteran, with the Sex Crimes Division of the Tampa Police Dept..

Detective Wolfe had two (2) patrol officers respond to my house and wait with me until he arrived, and then I was placed under arrest at 12:30 p.m. (Exh.# 12). Detective John Yaratch, a 19 year officer with T.P.D., who was assigned as a detective with the Sex Crimes Division, responded to my house, and Detective Jay Dickie, who has been a detective with Sex Crimes Division for seven (7) years, and with the T.P.D. for seventeen (17) years, was contacted to get a search warrant for my home. Det. Wolfe also contacted Evidence Technician, Edwin Rojas, (19 years with T.P.D.) to

collect evidence, and Detective Sheehan, a Tampa Police Detective, that has been deputized into an F.B.I. Task Force investigating computer crimes, to respond to assist in the search on my computer.

Detective Wolfe later testified that he was present in my office when the clothesline or rope was found in the bottom left hand drawer of my desk. (Exh.# 6, Pg.53, Lns., 5-7) This desk is where the computer was located that the alleged victim said she watched herself perform oral sex on me. Detective Wolfe had Evid. Tech. Rojas take two (2) pictures of this rope while it was still in the drawer, and these pictures are Exhibits 1 & 2. Look at these two photos <u>VERY</u> carefully, because this rope was the evidence that was tampered with, and these photos will prove it. Evid. Tech. Rojas, then placed the rope in an evidence bag, sealed it, and checked it into the Tampa P. D. property room.

On February 6th, 2001, the morning of my trial, the evidence bag with the rope in it, was brought into the courtroom already opened. The evidence bag was held open when Ms. Jeanneau testified, and she stated that it appeared to be the rope. The evidence bag was shown to Evid. Tech. Rojas, who testified that his initials were on the seal, and indicated that he had taken it into evidence, and only one of the photos, (Exh.#2) was entered into evidence at my trial. Asst. State Attorney Suzzanne Rossomondo asked Det. Wolfe during his trial testimony if the rope in the bag was in the same condition as when he found it, (Exh.# 11, Lines 9-13) but the rope was never taken out of the bag, and I'll explain why in a moment.

During the closing argument of my trial, my trial lawyer, Asst. Public Defender Ursula Richardson, conveniently pulled th rope out of the bag and told the jury it was "lily white." (Exh.#16, Pg. 2 Lines 1,2) Ms. Richardson told the jury that I had a dog in my house, terrazzo floors (See Exh.#3) and carpet in the office, but that the rope was brand new and there wasn't a speck of dirt, dog hair, carpet fiber, or feces on it.

During her portion of closing argument, Ms. Rossmondo picks up the rope by some knots and loops in it and says; "Look at the way it is tied, look at the way it was found put together in the drawer, and found by the Detective." (Exh.#4, Lines 16-18) Later Ms. Rossmondo tells the jury; "And what a coincidence that they found it in the computer room where she was tied up. And what a coincidence that the rope is tied where you can be locking someone's hands and legs together. What a coincidence." (Exh.#5, Lines 4-8)

The problem Mayor Iorio, is that if you look carefully at the crime scene photos of the rope, (Exh.#1&2) taken by Evid. Tech. Rojas when he took the rope into evidence, **THERE ARE NO KNOTS OR LOOPS IN**

4

**IT!** Somebody tied those knots and loops in it, and as I'll show you, the only people who had access to it were Asst. State Attorney Suzzanne Rossomondo, and Detective Wolfe. They opened the evidence bag in Ms. Rossomondo's office the morning of my trial. One of them tampered with evidence, both of them had knowledge of it, and I caught them red-handed!

The reason why this rope was tampered with at trial was because Ms. Jeanneau had some credibility problems. Seeing herself on the computer was impossible, because the computer had no camera hook-up available. She said that she was on her period, and was stripped naked in her bed, but when she had diarrhea on the white couch, she saw some of it fall on her panties, which was impossible because her panties were taken off in the bedroom. She further says that she took two showers because she felt dirty, but after all this she was still wearing the same pair of underwear the next day, when she went to the rape examiner, and they were taken from her. You are a woman, and I'm sure you would find it impossible for a woman on her period to go through an experience like this and put the same underwear back on.

Also, during deposition she had been adamant that we only had sex one time several years ago, she also reiterated this statement on direct examination by Ms. Rossomondo, and on cross-examination. Much to Ms. Rossomondo's dismay, when she tried to reinforce this testimony during re-direct examination, Ms. Jeanneau changed her testimony, and admitted we had sex on several occasions with the last time being eighteen (18) months before this incident. I was also charged with sexual battery with a knife, but at trial, for the first time, Ms. Jeanneau testified it could have been a knife, or it could have been a gun. Obviously, the jury did not buy this, because I was found guilty of sexual battery without a weapon. The point is, that my conviction would not have been obtained without the tampering of the evidence.

I raised the evidence tampering issue in my Motion For New Trial, after firing Ms. Richardson as my attorney, and the entire transcript of the testimony is attached as Exhibit #6. With this transcript, I can prove the evidence tampering, and several other problems that need to be investigated. Detective Wolfe testified that he saw the knots and the loops in the rope when he opened the evidence bag in Ms. Rossomondo's office the morning of my trial, to measure the rope. (Exh.# 6, Pg. 60) This brings up the interesting question of, if Ms. Rossomondo knew before trial that the knots and loops were in the rope and the alleged victim had substantial credibility problems, why not take the rope out during the evidence part of the trial and show it to the jury? The obvious answer is because the photo (Exh.#1) is

sitting on the prosecution table, showing that there were no knots and loops in it and she did not want it introduced as evidence and show it to the jury.

Mayor Iorio, I believe it is now time for me to explain why I'm not seeking judicial relief for you initiating an F.D.L.E. investigation. I am a Christian and I have a responsibility as a servant of Jesus Christ to tell the truth no matter how ugly it is. The truth is, the reason I know this rope was tampered with is because Ms. Jeanneau was tied up, but the rope entered at trial, **was not** the rope used. I had cut two (2), three-foot pieces off the rope and used it to tie her. Detective Wolfe and Ms. Rossomondo realized this when they took the rope out of the evidence bag, and realized it was six (6) foot too short. They realized that I had disposed of the rope used, so they tied the knots and loops in the part they found, which was brand new.

For several years in the past, I was involved in a fantasy dominate/ submissive/ bondage subculture. I'm unsure if you are aware or not, but there is a large subculture like this in Tampa that is centered in Ybor City. Ms. Jeanneau testified at trial that her and I had never had anal sex, which was not true. She changed her testimony at trial because she was afraid other people would be called as witnesses, and testify about the type of sexual behavior we were involved in. Ms. Jeanneau could "remember" having sex with me one time nine years ago, but was trying to hide the other four (4) or five (5) times. She was loosely bound for about forty-five minutes, and not for several hours like she said, which is why she did not have any marks on her wrists and ankles. This is not pretty, but it's the truth and it's how I know the rope entered at trial was tampered with.

People who are convicted of sex crimes are considered the lowest form of life on earth and as a Christian I can not stand silent and let Det. Wolfe and Ms. Rossomondo think that they can frame people just because they believe their guilty. Innocent people will go to prison by these people playing God, judge, and jury. I caught them and I'm sure this was not the first time they have done something of this nature. I'm not going to keep my pride and let innocent people be sent to prison. The sexual behavior I was involved in was wrong, and God has dealt with me severely for it. I'm telling you the truth, Mayor Iorio.

You must also realize that since I'm a college educated paralegal with several years experience in criminal law, I'm not dumb enough to leave that rope in the desk drawer next to the computer. When I was arrested, the piece of rope found was actually sitting on the window sill in the kitchen, still in the package. I knew exactly where it was because when the two uniformed police officers arrived at my house, they made me put my dog outside in the backyard. (Exh.#6, Pg.,32) The door to the backyard was in the kitchen, and

when I put the dog out, the rope was sitting in the window.

It took me awhile to figure out how the rope got in the desk drawer, but I can prove that Detective Wolfe, Detective Yaratch, and Detective Sheehan, the F.B.I. computer expert, were all involved. Detective Wolfe testified in the New Trial hearing that Det. Yaratch, and Det. Sheehan, were standing there when the drawer was opened. (Exh.#6, Pg. 53, Lines 11-14) Detective Wolfe said in his police report dated 9/20/00, (Exh.#8, Pg. 2) that the search warrant was read out loud after being recieved by Det. Dickie. Det. Dickie testified that the search did not begin until she arrived with the warrant, (Exh.#6, Pg.26, Lines 12-14) which is untrue because the rope was found <u>before</u> she got there.

Detectives Wolfe Yaratch, and Sheehan were searching the house before the warrant was served, which is in violation of Tampa Police Dept. policy. Det. Yaratch testified that he was at my house with Det. Wolfe, and Det. Sheehan showed up, and then eventually Det. Dickie showed up as he was leaving. (Exh.#6, Pg.22, Lines 14-17) Det. Yaratch testified he walked through the house and went into both the master bedroom, and the victims bedroom. (Exh.#6, Pg.22, Lines7-11) Det. Dickie testified the victim was there when she arrived, (Exh.#6, Pg. 25, Lines 6-9) and that the search did not begin until she arrived with the warrant. (Exh.#6, Pg. 26, Lines 7-18) Officer Warren testified when he arrived at the house with the victim, there were officers <u>inside</u> and outside the house. (Exh.#6, Pg. 29, Lines 19-21)

If you will notice, I ask Det. Wolfe what he did when he opened the drawer, and he said, "he closed the drawer"(Exh.#6, Pg. 53, Lines 16-18) This did not make any sense that he would close the drawer, but I believe he closed the drawer when he put the rope <u>IN</u> the drawer. Also you will notice, that several officers said they were in the house, but few admitted to searching anything. Everyone was backing up from admitting they searched anywhere. Also, Det. Wolfe violated Tampa Police Dept. policy by allowing the victim to remove her belongings while the search was being conducted, (Exh.#6, Pg. 30, Lines 3-8) and by not keeping a log or record of who was present during the execution of a search warrant, or at the crime scene. (Exh.#6, Pg. 50, Lines 18-19)

Another violation of Tampa Police Dept. policy was Det. Wolfe's failure to take the white couch cushions into evidence when he said they had feces stains on them. The victim said she had diarrhea on the couch, and Det. Wolfe acknowledged that he saw stains consistent with feces on the couch cushions, but failed to take them into evidence. (Exh.#14, Pg. 218, Lines 10-21) The victim told the rape examiner she was possibly penetrated anally by my penis. (Exh.#7) Det. Wolfe testified he told Evid. Tech. Rojas to take

pictures of the couch cushions, (Exh.#14, Pg. 218, Lines10-16) but Evid. Tech. Rojas denied this. (Exh.#13, Pgs. 195-196)

Tampa Police Dept. policy requires that any items containing bodily fluids in the location of a sexual battery, be taken into evidence for possible D.N.A. testing. All we had was Det. Wolfe's word, which was perjury, because there was no feces on the WHITE couch cushion. Det. Wolfe may be a liar, but he's not that incompetent as a detective. If there were stains on the couch cushion, he would have taken it into evidence. Exhibit #3 is the photo that Det.Wolfe told Evid.Tech. Rojas to take. (It's the back of the couch)

Det. Wolfe also committed perjury on several other occasions, and on one I can affirmatively prove it. At deposition, Det. Wolfe was asked if he found any knives in my house at all, and he responded, "No."(Exh.#10, Lines 1-7) At trial, Det. Wolfe testified that he found so many knives he could not take pictures of them all. (Exh.#9, Lines 13-23) His testimony at trial was a lie. The victim moved in my house on Sept.14th, 2000. and my prior roommate had moved out the previous weekend, taking the knife set from the kitchen. The only knives in the house were four (4) butter knives, and one (1) steak knife in the kitchen, and one (1) razor knife/ boxcutter in the top desk drawer.

You should also realize that Ms. Rossomondo was very brazen about what she did. I was prosecuted in 1988 on a kidnapping case in Hillsborough County by James Muench, who now is an Assistant United States Attorney in Tampa. Ms. Rossomondo had Mr. Muench attend my sentencing and he sat in the front row aisle seat in the gallery of the courtroom. Ms. Rossomondo took Det. Wolfe over and introduced Det. Wolfe to Mr. Muench as "the detective who tied the knots and loops in the rope."

This introduction by Ms. Rossomondo, was overheard by Niki Eakins (Exh.#15) partially by my sister who was sitting directly behind Mr. Muench, and by two other ladies sitting across the aisle from Mr. Muench, who were in the courtroom for the sentencing of another man named Adam Hutchison. Mr. Muench heard the statements that I made in the courtroom during sentencing, and as a federal prosecutor, has an obligation to report such conduct. Mr. Muench's failure to do this subjects him to criminal prosecution for being an accessory after the fact to evidence tampering.

Mayor Iorio, I believe all of this was allowed to happen because of a common practice in the Hillsborough County judicial system called "stamp trading." This practice is when a prosecutor and a defense attorney, usually an attorney from the Public Defender's office, decide before court what the outcome is going to be. The defense attorney will agree to "lay down" or not

8

to put on a defense, in trade for a favor in another case from the prosecutor. These "trades" are routinely done in the courtroom, hallways, over the phone, over lunch, and almost always with the judges knowledge. What is done in the courtroom, even during trials, is pre-determined by the prosecutor, defense counsel and if the judge does not know in advance, they look the other way. THIS IS NOT JUSTICE!!!

Let me show you a very good example of "laying down" by a defense attorney. Ms. Richardson told the jury early in her opening argument, how the jury would hear about an incident at my house on Dakota Ave. near Gandy and Manhattan. (Exh.# 17, Pg. 124, Lines 4-5) She then goes on to tell the jury she believes the evidence will show that Ms. Jeanneau crawled into bed with me on the night of the Hurricane, and performed oral sex on me. (Exh.#17, Pg. 124, Lines 9-22)

My house was located at 8101 N. Dakota Ave., which is one block south of Waters Ave. between Florida Ave. and Armenia Avenue, which is about **thirteen (13) miles** from the intersection of Gandy and Manhattan Ave. This incident occurred during the early morning hours of September 20th, 2000. I have obtained a Hurricane longitude/latitude tracking map of Hurricane Gordon from the National Weather Service in Ruskin, which shows that at **0000** hours of Sept. 20th, Hurricane Gordon was at latitude 40.0 N. and longitude 74.0 W. (Exh.# 18, Pg. 1) If you put these coordinates on the Hurricane tracking chart, on Sept. 20th, 2000, (Exh.#18, Pg. 2) you will see that Hurricane Gordon was located off the coast of **ATLANTIC CITY, NEW JERSEY**. (It passed off the coast of Tampa on Saturday, September 16th, 2000.)

When Ms. Richardson did this during opening argument, Asst. Public Defender Steven Green, was sitting at the defense table after assisting in jury selection. I asked him what Ursula (Ms. Richardson) thought she was doing, because my house was no where near Gandy Blvd., and the Hurricane had passed off the coast on Saturday, 9/16/00. Steven Green just sat there and closed his eyes and shook his head. You should also know, that at the time of my trial, Ms. Rossomondo had transferred to work as a prosecutor in another courtroom, and my case was the only case she kept in Judge Espinoso's courtroom. Also, Asst. Public Defender Ursula Richardson, is now an Asst. State Attorney, prosecuting cases in judge Espinosa's courtroom.

I believe an investigation will prove that Ms. Richardson "traded" me with Ms. Rossomondo, and that judge Espinosa knew about it. No attorney could be this incompetent, and Hillsborough County has a long history of bribery and corruption by judges and prosecutors. I have knowledge of the

9

"trading" practice from owning my own paralegal business, and working in the office of attorney's engaged in this practice. My father was Mac McLeod, who was Chief Deputy for Richard Ake, Clerk of the Circuit Court, for many years before retiring in 1999. You know my father because part of his job was to supervise the Clerk's data processing center, and they also counted the votes when you were Supervisor of Elections.

The last key figure in this that needs to be investigated is Assistant Public Defender John J. Skye, who is the Chief of the Felony Division for Public Defender Julianne Holt. Mr. Skye is the common link between Ms. Rossomondo, Ms. Richardson, and James Muench. Mr. Skye was James Muench's supervisor for State Attorney Bill James in 1988 when Mr. Muench prosecuted me. After Bill James left office, Mr. Skye left as Chief of the Felony Division for the State Attorney's Office, and went to the Public Defenders Office.

In 1989, one of the county commissioners raised concerns with State Attorney Bill James, over very questionable prosecution tactics by James Muench and John Skye was the person who smoothed things over. After my conviction, and before my sentencing in 2001, I contacted Ms. Holt about Ms. Richardson's conduct during my trial, and John Skye was the person assigned to deal with the problem. Mr. Skye has been known for about 20 years as the person who can "fix" cases. He was also present at my sentencing.

Mayor Iorio, you have some major crimes being committed within the Tampa city limits, and part of your duties as Mayor is supervising the Police Chief and Tampa Police Dept.. I caught the parties involved in this case red-handed, tampering with evidence, and the truth is going to come out, one way or another. While the T.P.D. Internal Affairs Division may be able to investigate the violations of Tampa Police policy, I believe the corruption in this case is on too big of a scale to be impartially investigated by anyone other than the Florida Dept. of Law Enforcement. I am requesting that you seek such an investigation.

I want to give you ample opportunity to do the right thing in this case. I trust in God the truth will come out. You should be aware that after being notified of these facts, if you fail to act, then when the truth does come out, you open yourself up, and the city of Tampa to a tremendous amount of civil liability for damages. I have told you the truth Mayor Iorio, and I hope and pray that you will do the right thing. Take care and God bless you.

                                                        Your Servant in Christ,

_____ 5-21-03
Steven A. McLeod

cc: With Exhibits 1-3 only:

Judge Jack Espinosa
State Attorney Mark Ober
Public Defender Julianne Holt
Ursula Richardson, Esq.
Suzzanne Rossomondo, Asst. State Attorney
Tampa Police Detective, Scott Wolfe
James Muench, Asst. U.S. Attorney
File

# EXHIBITS

### Exh. #

#1 - Crime Scene Photo of Rope Laying Flat
#2 - Crime Scene Photo of Rope Laying On Side
#3 - Crime Scene Photo of Back Of Couch
#4 - Trial Transcript Excerpt - Pg. 273 - Closing Argument - Ms. Rossomondo
#5 - Trial Transcript Excerpt - Pg. 280 - Closing Argument - Ms. Rossomondo
#6 - Motion For New Trial Transcript on March 16th, 3001
#7 - Sexual Battery Exam Report by ARNP Shirley Engle
#8 - Tampa Police Report Dated 9/20/00 by Detective Wolfe
#9 - Excerpt of Trial Testimony by Detective Scott Wolfe - Pg. 210
#10 - Excerpt of Deposition Testimony by Detective Wolfe
#11 - Excerpt of Trial Testimony by Det. Wolfe, Pg. 224
#12 - Hills. Co. Sher. Office- Booking report
#13 - Trial Testimony Excerpt of Evid. Tech. Edwin Rojas, Pgs. 195-96
#14 - Trial Testimony Excerpt of Detective Scott Wolfe, Pg. 213-218
#15 - Affidavit of Nicola Eakins dated April 3rd, 2001.
#16 - Excerpt of Opening Argument by Ursula Richardson, Pg. 266-7
#17 - Excerpt of Closing Argument by Ursula Richardson, Pgs. 124
#18 - Hurricane Tracking Information from National Weather Service



