1          IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL
           CIRCUIT IN AND FOR HILLSBOROUGH COUNTY, FLORIDA

2
                        CIRCUIT CRIMINAL DIVISION
3

4   STATE OF FLORIDA,
               Plaintiff,

5                                      Case No.: 00-15913
    vs.

6                                      Division: H
    STEVEN A. MCLEOD,

7              Defendant.
    _____/

8

9

10

11

12          This case came on to be heard before the
    HONORABLE Wayne S. Timmerman, Circuit Judge, at the

13  Hillsborough County Courthouse Annex, Tampa, Florida, on
    February 4, 2004, commencing at approximately 8:30 a.m.

14

15

16

17  APPEARANCES:

18  Michael Sinacore, Assistant State Attorney,
    800 East Kennedy Boulevard,

19  Tampa, Florida 33602
    On behalf of the State.

20

21

22

23

24                          —Exhibit #8                    —

25

                    AOC CIRCUIT COURT REPORTERS
                    HILLSBOROUGH COUNTY, FLORIDA

1                           I N D E X

2  WITNESSES                                        page

3

4  *SUSAN ROSSOMONDO*

5        Direct Examination . . . . . . . . . . . 3

6        Cross-Examination . . . . . . . . . . . 6

7  *URSULA RICHARDSON*

8        Direct Examination . . . . . . . . . . . 8

9        Cross-examination . . . . . . . . . . . 11

10        Redirect Examination . . . . . . . . . 18

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (THE FOLLOWING PROCEEDINGS ENSUED IN OPEN
 2    COURT.)
 3              MS. ROSSOMONDO:  Page 19 Steven McLeod.
 4              MR. SINACORE:  Mr. McLeod is on your docket for
 5        a hearing.  He has filed a 3.850 motion and he has
 6        filed a motion to disqualify the State Attorney's
 7        Office of this circuit from any further involvement
 8        in prosecuting this case.
 9              THE COURT:  I read your memorandum on that.
10              MR. SINACORE:  We need to put some testimony on
11        the record.
12              THE COURT:  Okay.  Step up and raise your right
13        hand.
14    WHEREUPON:
15                        SUSAN ROSSOMONDO
16    was called as a witness on behalf of the State of
17    Florida and, having been first duly sworn and/or
18    affirmed, was examined and testified as follows:
19                        DIRECT EXAMINATION
20    BY MR. SINACORE:
21        Q.   State your name, please.
22        A.   Susan Rossomondo.
23              THE DEFENDANT:  I believe this was my motion.
24        I believe I get to start first.
25              MR. SINACORE:  Judge, he has accused us of the
```

1 conflict.

2 THE COURT:  I understand what your argument is.

3 I read the State's motion.  You are claiming the

4 state attorney has a conflict because one of the

5 lawyers now works for the State Attorney's Office

6 used to represent you.

7 THE DEFENDANT:  Yes, sir.  It went a little

8 farther than that.

9 THE COURT:  How much farther did it go?

10 THE DEFENDANT:  There has been some allegations

11 of misconduct of Ms. Rossomondo and did so with

12 Ms. Richardson's knowledge.

13 MR. SINACORE:  It is the State's obligation to

14 show no conflict of interest.  Obviously you will

15 have an opportunity to ask any questions.

16 THE COURT:  Go ahead.

17 BY MR. SINACORE:

18 Q. State your name.

19 A. Susan Rossomondo.

20 Q. Why are you employed?

21 A. Assistant state attorney for Hillsborough

22 County.

23 Q. Were you the prosecutor responsible for trying

24 Mr. McLeod in 2001?

25 A. Yes.

1    **Q.**  Who was the defense attorney?

2    **A.**  Ursula Richardson.

3    **Q.**  Did Mr. McLeod actually go to trial?

4    **A.**  Yes.

5    **Q.**  Was he convicted by a jury?

6    **A.**  Yes, he was.

7    **Q.**  Has Ms. Richardson become employed by the State

8    Attorney's Office?

9    **A.**  Yes.

10    **Q.**  Have you had any communications with

11    Ms. Richardson where you have asked her to divulge any

12    confidential information that Mr. McLeod might have

13    provided to her?

14    **A.**  No.

15    **Q.**  Have you requested Ms. Richardson to assist you

16    in prosecuting this case in any manner?

17    **A.**  No.

18    MR. SINACORE:  That's all I have.

19    THE COURT:  You may inquire.

20    BY MR. MCLEOD:

21    **Q.**  Marked.  They have already been marked for

22    identification exhibits A and B.

23    THE WITNESS:  I am familiar with it.

24    Mr. McLeod sent this to me personally.  It is a

25    letter addressed to mayor Pam Iorio representing

1          misconduct prosecutorial misconduct on allegations

2          investigated by the Tampa Police Department.

3               THE COURT:  What are your questions?

4                         *CROSS-EXAMINATION*

5     BY MR. MCLEOD:

6          Q.  Have you received a copy of this.

7          A.  Yes.

8          Q.  Do you know approximately when you received it?

9          A.  I don't.

10         Q.  It was mailed on May 21.  Would it have been

11    before Memorial Day or after?

12         A.  I have no idea when I received it.

13         Q.  When you received it what did you do?

14         A.  I read it and placed it in the file.

15         Q.  Did you speak to your supervisors about it?

16         A.  I may have mentioned it to Mr. Sinacore.  I

17    received similar letters from you and I have given them

18    to Mr. Sinacore.

19         Q.  He is the supervisor in this division?

20         A.  Yes, he is.

21         Q.  You are stating that the days following this

22    you never had any conversations with Ms. Richardson

23    concerning that letter?

24         A.  I may have told her I received a letter from

25    you.  We never discussed her representations of you.

1        **Q.**  Where did that conversation take place?

2        **A.**  In our office probably or in the hallways

3    passing.

4        **Q.**  You did discuss the fact that you had received

5    that letter and those allegations.

6        **A.**  I think I probably mentioned to her I received

7    a letter suggesting I have been guilty of the

8    allegations and it was in passing meeting.

9        **Q.**  You were aware those allegations were made

10   previously for my motion for new trial?

11       **A.**  Absolutely.

12       **Q.**  Why would you feel it necessary to speak to her

13   about it after you received that letter?

14           MR. SINACORE:  Objection, relevance, Your

15       Honor.

16           THE COURT:  Overruled.

17           THE WITNESS:  It was a comment made in passing.

18   BY MR. MCLEOD:

19       **Q.**  You never discussed any of the discussions with

20   Ms. Richardson?

21       **A.**  Never.

22       **Q.**  Were there any cell phone conversations taken

23   place with Ms. Richardson concerning this matter?

24       **A.**  If she has a cell phone I don't have her

25   number.

1  **Q.** Are you familiar with the sandwich shop that's

2 on the bottom floor of the county center?

3  **A.** Yes.

4  **Q.** Do you ever eat lunch there?

5  **A.** I have.

6  **Q.** Did you eat lunch there with Ms. Richardson in

7 the week receiving that letter?

8  **A.** I don't recall I have ever had lunch with

9 Ms. Richardson.

10   MR. MCLEOD: Nothing further.

11   MR. SINACORE: Nothing further. May she be

12  excused?

13   THE DEFENDANT: There was a couple of other

14  motions on the docket that needed to be resolved.

15  I think one of them involve Ms. Rossomondo.

16   THE WITNESS: I can stay.

17   MR. SINACORE: Call Ms. Richardson.

18 WHEREUPON:

19     URSULA RICHARDSON

20 was called as a witness on behalf of the State of

21 Florida and, having been first duly sworn and/or

22 affirmed, was examined and testified as follows:

23     *DIRECT EXAMINATION*

24 BY MR. SINACORE:

25  **Q.** Tell us your name.

1       **A.**  Ursula Denise Richardson.

2       **Q.**  Where are you currently employed?

3       **A.**  The State Attorney's Office for Hillsborough

4   County.

5       **Q.**  Did you represent Mr. McLeod during his trial

6   in February of 2001?

7       **A.**  I did.

8       **Q.**  Where were you employed at the time?

9       **A.**  At the Public Defender's Office.

10      **Q.**  When did you provide notice that you were

11  leaving the Public Defender's Office?

12      **A.**  July 15 of 2002 when I provided my resignation.

13      **Q.**  When did you accept the job with the State

14  Attorney's Office?

15      **A.**  July 12, 2002.  I resigned on Monday.

16      **Q.**  When did you begin your employment?

17      **A.**  August 19 of 2002.

18      **Q.**  What specifically is your position with this

19  office?

20      **A.**  I am deputy chief in the sex offender's

21  division.

22      **Q.**  Ms. Richardson, when you came over to this

23  division were there cases pending that you had some

24  involvement as a public defender?

25      **A.**  Absolutely.

1      **Q.**  Were ground rules put in place how you were to

2  handle or extra procedures were to be followed with you

3  as a state attorney in those cases?

4      **A.**  Yes.

5      **Q.**  Can you explain to the Court what those

6  procedures were?

7      **A.**  Specifically the public defender's office

8  identified all cases I had any type of involvement,

9  regardless whether I was the actual attorney or if I

10  stood in for another attorney or spoken to the client

11  briefly, all cases that I tried, all cases that might

12  potentially have some contact as far as another attorney

13  discussing their strategy with me.  I provided my own

14  personal list to the State Attorney's Office of cases I

15  knew for sure that I had active involvement in and those

16  cases were given to other attorneys.  They were never

17  discussed with me.  All of those cases were taken

18  exclusively to Mr. Sinacore.

19      **Q.**  Have you had any involvement in prosecuting any

20  of the cases that you were involved in as a defense

21  attorney?

22      **A.**  I have not.

23      **Q.**  With regards to Mr. McLeod's case have you had

24  any involvement in prosecuting Mr. McLeod's case?

25      **A.**  I have not.

1      **Q.**    Have you had any occasion to discuss any

2    confidential or privileged communications you may have

3    learned as far as your representation with Mr. McLeod

4    with any assistant state attorney?

5      **A.**    No.

6      **Q.**    Have you been instructed to avoid any such

7    situation?

8      **A.**    Absolutely.

9           MR. SINACORE:  Pass the witness.

10           THE COURT:  You may inquire.

11                    *CROSS-EXAMINATION*

12    BY MR. MCLEOD:

13      **Q.**    How did it come about that you became employed

14    by the State Attorney's Office?

15      **A.**    I was made an offer and I accepted it.

16      **Q.**    Who made the offer?

17      **A.**    I believe it was initially Karen Stanley but

18    Mr. Sinacore extended the phone call.

19      **Q.**    During your time in working for the Public

20    Defender's Office you specialized in just defending

21    cases involving sexual offenses?

22      **A.**    The last two years of my employment with the

23    Public Defender's Office.

24      **Q.**    You had specific training in doing that?

25      **A.**    Absolutely.

1       **Q.** So that was part of the attraction the State

2   Attorney's Office had in hiring because you were

3   experienced in dealing with those types of cases?

4       **A.** I am not sure what their attraction was. I am

5   sure my performance in the courtroom. I am sure the way

6   I present myself as an attorney. I am sure there were a

7   number of things attracted them to me.

8       **Q.** You were aware when you became employed by

9   their office that you would be working specifically in

10  dealing with sex offender cases; is that correct?

11      **A.** Absolutely.

12      **Q.** Division H is the only division that prosecutes

13  those types of cases?

14      **A.** That's correct.

15      **Q.** It was automatically assumed you will be going

16  to work right in the same courtroom that you had just

17  left defending people?

18      **A.** I don't believe it was automatically assumed

19  when I applied with the State Attorney's Office. That

20  was a discussion I had this is what I specialize in.

21  This is what I am good at and this is where I wanted to

22  be.

23      **Q.** You were aware that you will be working in

24  Division H.

25      **A.** On July 12, 2002 I was aware I was come to go

1  Division H.

2      Q.   When you actually became employed on August 15;
3  is that correct?

4      A.   Yes.

5      Q.   And on August 19 you began working in this
6  courtroom?

7      A.   Yes.

8      Q.   In four days time you switched from defender to
9  prosecutor?

10     A.   I absolutely did.

11     Q.   You said there was a list of cases that you had
12  been given.  Was my case one of them?

13     A.   I believe it was.

14     Q.   Who would have that list?

15     A.   Whether it would be Mr. Sinacore or the Public
16  Defender's Office.  Each provided a list.  I believe it
17  was Samantha Ward or Julianne Holt had the assistants go
18  through any cases where I stood in for someone else and
19  I provided my own list and Mr. Sinacore might have that
20  list.

21     Q.   You are aware that any post conviction motions
22  would come back in the same division?

23     A.   I am aware of the procedure, yes, sir.

24     Q.   And Mr. Sinacore is your boss?

25     A.   That's correct.

1      Q.   You said that other attorneys are assigned

2   these cases that are involving you?

3      A.   That's correct.

4      Q.   Who is that?

5      A.   The attorneys in this division.

6      Q.   Are they attorneys that work under you?

7      A.   Yes.

8      Q.   So you actually supervised attorneys that are

9   now responsible for handling cases that you used to

10   defend?

11      A.   That's correct.  Which is why they were

12   instructed to go to Mr. Sinacore to discuss those cases

13   and not me under any circumstances.

14      Q.   I just don't understand how you consider it not

15   a conflict when you are supervising people who are

16   prosecuting cases that you used to defend.

17           THE COURT:  That's not a question, sir.

18   BY MR. MCLEOD:

19      Q.   Exhibit A, did you receive a copy of that?

20      A.   I don't know if I received a copy.  I know you

21   sent me a letter to that effect.

22      Q.   Do you recall seeing it?

23      A.   I remember seeing this and I remember you

24   sending another letter.  I don't know if that letter was

25   handwritten or typed.

1    **Q.**  Did you receive that?

2    **A.**  I believe I did.

3    **Q.**  Did you read it?

4    **A.**  I am almost positive I read the first letter

5  because the only thing I remember you started with

6  Ursula, Ursula, Ursula, oh what a tangle web we weave.

7    **Q.**  Did you read that letter?

8    **A.**  I might have glazed over it.

9    **Q.**  You are not aware of any of the allegations

10  that were made concerning your role in the evidence

11  tampering?

12    **A.**  Not specifically.

13    **Q.**  Ms. Rossomondo said you had a conversation

14  about that?

15    **A.**  I am sure she mentioned to me that this came

16  in.  The only letter I remember receiving is the one you

17  started calling my name several times.

18    **Q.**  Did you discuss that one with her?

19    **A.**  No.  I know I discussed it with Mr. Sinacore.

20    **Q.**  Where did you discuss that letter with her

21  Exhibit A?

22    **A.**  Probably in passing.  We are not even in the

23  same building.

24    **Q.**  You did discuss that with Mr. Sinacore?

25    **A.**  I most definitely did because he is the one

1    handling your case.  I most definitely would have let

2    him know.

3        Q.   What was the context of your discussion?

4        A.   Letting him know you sent me a letter and

5    handing him a copy of it.  That other letter I am

6    mentioning as well is also with him.

7        Q.   He is your supervisor, correct?

8        A.   Absolutely.

9            THE DEFENDANT:  I would like to introduce

10       Exhibit B.

11           MR. SINACORE:  No objection to introducing both

12       exhibits.

13           THE COURT:  They will be entered into evidence.

14           (STATE'S EXHIBIT NUMBER A and B WAS RECEIVED IN

15   EVIDENCE.)

16   BY MR. MCLEOD:

17       Q.   You discussed these letters with Mr. Sinacore,

18   correct?

19       A.   Absolutely.

20       Q.   I would like Ms. Richardson to take a look at

21   Exhibit B.  Who signed it, Ms. Richardson?

22       A.   Most likely Mr. Sinacore.

23       Q.   Are you aware that he has participated in the

24   prosecution?

25       A.   I am aware he is the person that signs the

1    information for the sex caseS.

2        Q.   That's not the question.  Are you aware that he

3    has personally participated in the prosecution?

4        A.   Was I aware that he signed the information in

5    your case?

6        Q.   That he has participated in the prosecution?

7        A.   I am aware after the fact when you began to

8    write your letters and these types of things he became

9    involved but not before.

10        Q.   You didn't realize he took this case at first

11    appearance and was the prosecutor at the bond hearing?

12        A.   No.

13        Q.   You have had conversations about this case even

14    though you were aware that he signed the information and

15    is participating in this prosecution?

16        A.   I am aware he signs all of the information with

17    reference to sex cases.  As far as any conversation that

18    I have had with him it has been since you started

19    writing me personal letters and turning those over to

20    him.

21        Q.   You are aware that he has been a prosecutor in

22    this case?

23        A.   Obviously now he is the prosecutor.

24        Q.   You were aware when you were talking with him

25    that he signs the information that is participating in

1    the prosecution, correct?

2        **A.**   If that's how you categorize it then that

3    question is yes.

4        **Q.**   You have had conversations with him knowing

5    that he is working in the prosecution in this case?

6        **A.**   I don't know how to answer that question.  I am

7    assuming the answer you are looking for is yes so I am

8    assuming yes.

## *REDIRECT EXAMINATION*

10   BY MR. SINACORE:

11       **Q.**   Ms. Richardson, I asked you before whether you

12   had any discussions with Ms. Rossomondo in particular

13   about any confidential communication or privileged

14   communications you may have learned as part of your

15   representation of Mr. McLeod.  Have you had any

16   conversations with me or any other assistant state

17   attorney or Mark Ober any privileged communications or

18   confidential communications that you were privy to as a

19   result of your representation of Mr. McLeod?

20       **A.**   Absolutely not.  Even with the 3.850 proceeding

21   pending no discussion has ever been had with any state

22   attorney about what you and I personally discussed.

23       **Q.**   Have I asked you to actively participate as a

24   prosecutor in this case?

25       **A.**   No.

1      THE COURT:  Any other witnesses?

2      THE DEFENDANT:  No.

3      THE COURT:  Care to be heard?

4      THE DEFENDANT:  Go ahead.

5      MR. SINACORE:  Your Honor, I have presented a

6      memorandum.  You said you read it.  I will rely on

7      my memorandum.

8      THE COURT:  Did you provide a copy to

9      Mr. McLeod?

10     MR. SINACORE:  Yes.  Basically this is not a

11     conflict of interest for the State Attorney's

12     Office.  Ms. Richardson is adequately screened.

13     This is not a pending case.  This case is in no

14     status as far as the state attorney's concern.  We

15     have not been asked to respond on a 3.850.

16     THE COURT:  This is the only matter pending.

17     THE DEFENDANT:  There is a 3.850 pending.

18     MR. SINACORE:  The State has not been asked to

19     get involved in that juncture.

20     THE COURT:  I will accept your word that a

21     3.850 has been filed.

22     MR. SINACORE:  If in the event of a 3.850 the

23     State is asked to respond to that I will present

24     the case law which shows that there is a waiver

25     that goes along with that and Ms. Richardson will

1    be allowed to be a witness and discuss any

2    privilege communications that are relevant.

3         THE COURT:  If the 3.850 is Ms. Richardson.

4         MR. SINACORE:  Correct.  Anything that would

5    involve her to defend or be a witness or alleging a

6    conflict of interest or inadequate representation.

7    There is a waiver involved with that.  Mr. McLeod's

8    motion it might be a little bit premature.

9    However, Judge Espinosa wanted it addressed.

10   Ms. Richardson is screened and there is no basis to

11   disqualify the State Attorney's Office.  We did

12   conduct several hearings where we had pending

13   cases.  Judge Espinosa conducted those hearings.

14   He denied all those requests and they were taken to

15   the Second DCA on writs and none of those

16   prosecutions--

17        THE DEFENDANT:  I am troubled by the fact

18   Ms. Richardson and Mr. Sinacore had conversations.

19   *Reeves vs. State* caution the state attorney any

20   prosecutor who is disqualified be adequately

21   screened.  I don't think they can say that has

22   occurred when they have had conversations with Mr.

23   Sinacore.

24        THE COURT:  What kind of conversations?

25        THE DEFENDANT:  I don't know.

1    THE COURT:  She said she had no conversations

2    concerning you or your case.  So what kind of

3    conversations are you talking about?

4    THE DEFENDANT:  I couldn't narrow those down.

5    Obviously she is not going to admit she has done

6    something wrong.

7    THE COURT:  That presumes she has done

8    something wrong.  Where is the evidence that she

9    has done anything wrong?

10   THE DEFENDANT:  She said her and Ms. Rossomondo

11   had conversations about those letters.

12   THE COURT:  I heard what she testified to.

13   THE DEFENDANT:  I think the very fact they had

14   conversations at all--

15   THE COURT:  Hey I got a letter from this guy

16   that you used to represent.  You think that

17   constitutes a conflict?

18   THE DEFENDANT:  Yes, sir.  Under *Castro* I

19   believe it does.  Under *Reeves* I don't see how they

20   can meet their burden to say she has been

21   adequately screened.  She had conversations with

22   Mr. Sinacore.  He actively participated in the

23   prosecution.

24   THE COURT:  Did she say she had discussions

25   with Mr. Sinacore concerning the facts and

AOC CIRCUIT COURT REPORTERS
HILLSBOROUGH COUNTY, FLORIDA

1   confidential communications?  I didn't hear her say

2   that.

3       THE DEFENDANT:  She discussed things that were

4   in the letter.  Obviously if she did have them I

5   wouldn't expect her to admit it.

6       THE COURT:  That presumes she has done

7   something wrong.  The testimony is otherwise.

8       THE DEFENDANT:  The fact they had

9   conversations, Your Honor, I believe would

10  disqualify her.

11      THE COURT:  Anything further?

12      THE DEFENDANT:  Not on that motion.

13      MR. SINACORE:  No.

14      THE COURT:  The motion what is on the table

15  right now is your motion to disqualify the State

16  Attorney's Office from any further participation in

17  your case.

18      THE DEFENDANT:  Yes.

19      THE COURT:  That motion is denied.

20      THE DEFENDANT:  Your Honor, I would like to see

21  about getting a transcript of this proceeding so I

22  can file a cert.

23      THE COURT:  I am sure you know how to do that.

24      THE DEFENDANT:  I have already been found

25  indigent.

 1          THE COURT:  I am sure you know how to do that.

 2          THE DEFENDANT:  There were several other

 3     motions that were pending also.

 4          MR. SINACORE:  Mr. McLeod is a prolific writer.

 5     We have received several things.

 6          THE COURT:  What else is on the docket?

 7          CLERK:  That's the only thing I knew about.

 8          THE COURT:  Give it to the bailiff.

 9          THE DEFENDANT:  It was noticed for the

10     January 8th hearing which I wasn't pick up for.

11          THE COURT:  What other motion do you have?

12          THE DEFENDANT:  A motion to compel the state to

13     provide exhibit size crime scene photos.  I had

14     written Ms. Rossomondo.

15          THE COURT:  The clerk says she has no such

16     motion in the file.

17          MR. SINACORE:  He has written letters to our

18     office.  I don't know if he put it in the form of a

19     motion.  He did a public records request.  He asked

20     for crime scene photographs.  He was given an

21     amount to pay for those photographs.  He was

22     provided photographs.  However, he is asking for

23     larger photographs.

24          THE DEFENDANT:  I wasn't provided with the

25     photographs I was charged for.

1          CLERK:  Looking at my screen we received them

2    and they have been forwarded to the law clerks

3    office.  They are not set for anything at the

4    moment.

5          MR. SINACORE:  I will waive the notice.  I

6    think we can deal with this.

7          THE COURT:  Mr. Sinacore has agreed to hear the

8    motions.

9          THE DEFENDANT:  One was a motion to compel the

10   exhibit size photos.  I wrote Ms. Rossomondo on

11   July 31, 2001 requesting the cost on getting ten by

12   14 exhibit size photos.  She sent me a letter which

13   was 137 for 28 of them which came out to five

14   dollars a piece.  I sent her $15 for three of them.

15   I got print size photographs instead of the exhibit

16   size that I had paid for.  I have written several

17   times to get it resolved.  They never sent me the

18   photographs that I paid for.

19         THE COURT:  You want three photographs ten by

20   14?

21         THE DEFENDANT:  Yes.

22         THE COURT:  Do you know which three they are?

23         THE DEFENDANT:  Yes.

24         THE COURT:  Are they identified by number?

25         THE DEFENDANT:  Yes.  She is aware of the three

1    photographs.

2        MR. SINACORE:   In that situation Ms. Rossomondo

3    contacted Tampa Police Department.  They charge

4    five dollars a photograph.  They provided those

5    photographs.  They were forwarded to Mr. McLeod.

6    The state has given him photographs.  I don't think

7    the state is under any obligation under 119 or any

8    other procedure provision to provide a certain type

9    of photograph an eight by ten or any other type

10    photograph.  We are giving him what he requested.

11        THE COURT:  He says he wanted three large

12    photographs.  He was told they were $15 and he sent

13    somebody $15.  Where did the money go?

14        MS. ROSSOMONDO:   Judge, Mr. McLeod sent me a

15    question.  I contacted the police department

16    because the photographs were not in my possession.

17    The ones I used at trial were submitted to the

18    clerk.  In an effort to expedite Mr. McLeod getting

19    the document, they gave me the price, so I

20    submitted that check to the Tampa Police

21    Department.  They got me the pictures.  I was

22    really the middle person in that.

23        THE COURT:  Were the photographs ten by 14?

24        MS. ROSSOMONDO:  They were normal size

25    photographs.  But that's what the police department

1    charges for that size photographs.

2        THE COURT:  What difference does it make what

3    size they are?  You can have it made as big as this

4    building.

5        THE DEFENDANT:  It's more difficult for me to

6    do.  I asked for the ten by 14.

7        THE COURT:  Anything further?

8        MR. SINACORE:  Ms. Rossomondo acted to try to

9    facilitate this request when these were items in

10    the possession of Tampa Police Department.

11    Compelling the state attorney to do anything

12    further--our crime scene photos were put into

13    evidence.  They were with the clerk.  If he wants

14    to ask the clerk for public records but the state

15    attorney could not.

16        THE DEFENDANT:  The problem I have is that TPD

17    keeps referring me back to her.

18        CLERK:  The clerk's office cannot release the

19    evidence without a court order.

20        THE COURT:  The evidence is not going to be

21    released and taken out of the court file.  That's

22    not going to happen.  Copies is a different thing.

23    You extended yourself to the Tampa Police

24    Department told them what he wanted gave them the

25    money he sent.  Who was the check made out to?

1      THE DEFENDANT:  City of Tampa Police

2   Department.

3      MS. ROSSOMONDO:  I got the photos and sent

4   them.

5      THE COURT:  Anything further?

6      THE DEFENDANT:  No.

7      THE COURT:  The State Attorney's Office has no

8   further obligation in this case.  The way I look at

9   it they were doing you a favor.  They didn't have

10   to do anything.  They sent the money to the police

11   department and the police department forwarded the

12   photographs and she sent them to you.

13      THE DEFENDANT:  They weren't what I paid for.

14      THE COURT:  That's a problem you got with the

15   Tampa Police Department.  State Attorney's Office

16   if I had been Ms. Rossomondo's supervisor I would

17   have said don't do it.  Let him work with the Tampa

18   Police Department.  As far as I am concerned she

19   went out on a limb and now she is being criticized.

20      THE DEFENDANT:  I was told I had to go through

21   her.

22      THE COURT:  And she did.  I am not going to

23   require them to do it again.  I am not going to

24   require them to procure large photographs for you.

25   If you want them get them from the Tampa Police

1  Department.  I am sorry.  I can appreciate your

2  predicament, but they are not going to act as your

3  agent to chase down evidence.

4  THE DEFENDANT:  If I hadn't asked for ten by 14

5  and told $15 and supplied the $15 and didn't get

6  the ones I asked for every time I write TPD they

7  tell me I have to go back to her.  I have written

8  Curtis Smith.  These photographs I received last

9  April.

10  THE COURT:  Prepare an order directing that the

11  Tampa Police Department furnish you with what you

12  paid for in terms of the evidence in this case.

13  Send a copy of the order to the State Attorney's

14  Office so they can review it if they think it is

15  appropriate.

16  THE DEFENDANT:  The last motion I needed to

17  resolve was in respect to attorney client privilege

18  documents that the Public Defender's Office has.  I

19  wrote them and asked them for copies of letters I

20  had sent Ms. Richardson because it would help my

21  3.850.  I should be entitled to the letters.

22  THE COURT:  Didn't you keep copies.

23  THE DEFENDANT:  No.  I couldn't get copies of

24  them.

25  THE COURT:  Do you think that's a problem for

1      the State Attorney's Office?

2          THE DEFENDANT:  It was a motion I filed as far

3      as to the Court for a court order requiring the

4      Public Defender's Office to--

5          THE COURT:  Did you notice the Public

6      Defender's Office of this motion?  Now your motion

7      is directed to the public defender.  Did you notice

8      them?

9          THE DEFENDANT:  Yes.

10         THE COURT:  Is that in the file?

11         CLERK:  Yes.

12         THE COURT:  Are you prepared to respond to

13     this, Mr. George?

14         MR. GEORGE:  If you can give me a few minutes.

15         THE COURT:  Take a look at the one the clerk

16     has.  I would like to dispose of this if we can.

17     He is wanting confidential communications when

18     Ms. Richardson was his lawyer.

19         MR. GEORGE:  Can I work on this?  Can we pass

20     it for a few minutes.  I can make a phone call.

21         THE COURT:  Okay.

22         THE DEFENDANT:  I want copies.

23         THE COURT:  You want the public defender to

24     make copies for you?

25         THE DEFENDANT:  Yes.

1    MR. SINACORE:  Is there any other matter at

2    this time so Ms. Rossomondo can go back to her

3    courtroom?

4        THE DEFENDANT:  No.

5        THE COURT:  We will pass it for a few minutes.

6

7    *(THE CASE WAS PASSED AND RECALLED.)*

8        MS. ROSSOMONDO:  Page 19 Steven McLeod.

9        MR. GEORGE:  Judge, I had contact with my

10   office.  He is entitled to the letters he is

11   requesting.  I have asked my secretary to have the

12   file pulled and brought over here.  I would like to

13   make copies today and get it to him if we can leave

14   him around to get that done.

15       THE COURT:  Let Mr. McLeod remain to get copies

16   for him.  Are you going to take it upon yourself to

17   do that?

18       MR. GEORGE:  Yes.

19       THE DEFENDANT:  I would like the record reflect

20   that the sheriff's office can transfer me back to

21   the Department of Corrections.  The 3.850 is still

22   pending.

23       THE COURT:  I am sure they will be glad to get

24   you out of the county jail.

25       *(THE PROCEEDINGS CONCLUDED.)*

1                    CERTIFICATE OF REPORTER

2

STATE OF FLORIDA
3    COUNTY OF HILLSBOROUGH

4

        I, Natalie Lama, AOC Circuit Court Reporter,
5    hereby certify that I was authorized to and did report
     the foregoing proceedings had in the previously-styled
6    cause; and that the preceding transcript attached hereto
     is a true, accurate, and correct computerized
7    transcription of said proceedings.

8        I further certify that I am not employed by or
     related to any of the parties in this matter, nor am I
9    financially or otherwise interested in this action.

10       IN WITNESS WHEREOF, I have hereunto set my hand
     in Tampa, Hillsborough County, Florida.

11

12

13       _Natalie Lama_____
         Natalie Lama
14       AOC Circuit Court Reporter

15

16

17

18

19

20

21

22

23

24

25

                    AOC CIRCUIT COURT REPORTERS
                    HILLSBOROUGH COUNTY, FLORIDA