FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   09/22/2004

STEVEN A. McCLEOD, white male, DOB 11/30/60, SSN 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, Florida Department of Corrections Inmate number A-924820, was interviewed at the Hamilton Correctional Institution, 10650 S.W.46th Street, Jasper, Florida 32052, telephone number (386) 792-5151, where he is serving a life sentence. McCLEOD was advised as to the identity of the interviewing agents and as to the nature of the interview. He then provided the following information:

McCLEOD has completed 3 years of college. After being released from prison in 1991 he attended Paralegal Careers, a small private school and graduated in 1993 as a paralegal. He worked for [ ] in Tampa from 1994 to 1995 as a free lance paralegal, then started his own company called National Legal Alliance. The company worked with Federal Criminal Defense attorneys. McCLEOD reviewed the legal aspects of wire tap (Title III), surveillance, indictments and affidavits for defense attorneys.

b6 -2
b7C -2

McCLEOD advised his father, HUGHEY McCLEOD was the Chief Deputy to the Clerk of Circuit Court, RICHARD AKE, in Hillsborough County. Therefore, McCLEOD either knew personally many of the judges or knew of many of the judges in Hillsborough County.

McCLEOD stated he knew the late HARRY COE, former Circuit Court Judge in Hillsborough County. In 1991 COE became an elected State Attorney. He was ruthless in prosecution. In 2000 he came under investigation regarding worthless or forged checks and having guns in his office. COE had a $200,000/year income and often visited gambling websites on his laptop computer. McCLEOD said one day COE was found dead.

McCLEOD advised the written statement he made in his letter to Judge MENENDEZ, "The last case I have personal knowledge of happened a month before my arrest," was the following:

[ ] had been out of jail for [ ]

[ ]. In August 2000 Tampa Police Detectives on the vice squad, came to their house, knocked the front door and bedroom

b6 -3
b7C -3

Investigation on   9/21/2004   at Jacksonville, Florida

File # 194A-TP-55469     Date dictated   9/22/2004

by   SA [ ]
SA [ ]

b6 -1
b7C -1

McLeod-1

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

*Exhibit #1A*

FD-302a (Rev. 10-6-95)

194A-TP-55469

Continuation of FD-302 of   __Steven A. McCLeod_____ , On __9/21/2004__ , Page __2__
C

door down and arrested⎍_____
⎍_____ McCLEOD advised he
knew⎍_____ last name but could not recall it at the moment.  He
said in June 2002⎍
⎍_____
⎍_____ sometime in August
2000⎍____⎍came to the N. Dakota address to discuss the proceedings
with⎍_____⎍ The met in the living room.  McCLEOD and another
man named⎍_____⎍ McCLEOD
said he did not know⎍_____

⎍_____
                                     b6 -2,3
                                 b7C -2,3
sentence.  McCLEOD saw⎍_____
⎍_____

       The next morning McCLEOD went to court with⎍_____
⎍_____⎍to wait a moment while he walked
out into the hallway and met with the prosecutor.  McCLEOD did not
know the prosecutor's name.  McCLEOD watched out the glass door
window into the hallway and⎍_____
⎍_____⎍the night before.  The       b6 --3
courtroom.⎍_____⎍                    b7C -3
jail sentence.  McCLEOD had not seen or spoken to⎍_____⎍ since
his he⎍_____⎍ McCLEOD said Judge ESPINOSA may
have been the presiding judge.

       McCLEOD described⎍_____ b6 -3
⎍_____ b7C -3
⎍_____

       McCLEOD then advised another written statement he made in
his letter to Judge MENENDEZ, "I personally made 4 payments for a
defense lawyer to the late HARRY COE on East Street which runs
behind the Annex," was the following:

       The four instances occurred from⎍_____⎍and were all
for HARRY COE.  They occurred while McCLEOD⎍_____
⎍_____⎍ LNU.  McCLEOD would not give⎍_____
last name because he said⎍_____ b6 2,3
⎍_____ b7C 2,3
⎍_____

                                                      McLeod-2

FD-302a (Rev. 10-6-95)

194A-TP-55469

Continuation of FD-302 of    __Steven A. McCLeod__    b6 2,3     , On __9/21/2004__ , Page __3__
C                                 b7C 2,3

cases. [ ] defended a lot of subjects on drug charges. [ ]
[ ] would have
McCLEOD file legal paperwork at the courthouse on a regular basis.
McCLEOD usually did it at the end of the day on his way home.  A
man called [ ] always came to [ ] office with a lunch sac.  One
day after [ ] left [ ] office, [ ] told McCLEOD he wanted to
talk to him.  McCLEOD was going to the courthouse to drop off some
legal paper for [ ] on his way home. [ ] asked McCLEOD if he knew
who HARRY COE was.  McCLEOD said he did. [ ] then asked McCLEOD to
drop off a manila envelope to COE at COE's car, which was parked on
East Street behind the Annex.  The manila envelope was stapled at
the top and taped with thick binding tape at the top also. [ ]
told McCLEOD to take the envelope to COE before he went to the
Courthouse.  The next morning [ ] thanked McCLEOD.

About a week to ten days later [ ] asked McCLEOD to do
the same thing again.  Deliver a manila envelope to COE at his car.
The third time [ ] asked McCLEOD to deliver a manila envelope to
COE he didn't bind the envelope with tape.  The flap was open a bit
so McCLEOD looked in the envelope and saw there were stacks of
money in it.  So the fourth time [ ] asked McCLEOD to take a manila
envelope to COE, McCLEOD took an empty envelope with him.  McCLEOD
went into the bathroom, tore open the envelope [ ] had given him,
took out $8,000 in cash, kept $1,000 and put the remaining $7,000
in the new envelope and sealed it.  McCLEOD then gave COE the    b6 -3
envelope. [ ] did not say anything to McCLEOD about the delivery b7C -3
However, [ ] never asked McCLEOD to deliver an envelope to COE
again.

McCLEOD advised [ ] probably did not know what was going
on with [ ] and his deliveries to COE.  He advised [ ] was very
honest. [                                                          ]
area.                                                   b6 -2,3

McCLEOD advised he has more information regarding    b7C -2,3
corruption in Hillsborough County but needs time to correctly
delineate it.  Agents gave McCLEOD a written list of the specific
points in detail to cover for each instance.  He advised he would
write down the details of the incidents and send them to the FBI
Tampa Office, Public Corruption Squad.

McCLEOD advised his motive for contacting Judge MENDEZ
after being incarcerated for four years was 1) McCLEOD believes
evidence in his case was tampered with and hurt his case; 2) He has

FD-302a (Rev. 10-6-95)

194A-TP-55469

Continuation of FD-302 of ____Steven A. McCLeod_____ , On 9/21/2004 , Page ___4___
C

had time to reflect, read Hillsborough County cases in the law
library at the prison and does not want what has occurred in his
case (possible evidence tampering) to happen to someone else.

McCLEOD advised he is willing to take a polygraph
examination.  He advised he will be in Tampa some time in November
for a post conviction matter.  He will be housed in the
Hillsborough jail and is willing to speak to agents in the FBI
Tampa Office at that time.

McCLEOD then advised he had some information regarding
terrorism that may be useful.  When he was arrested by the State
his computer was seized.  He said the State should still have his
computer.  McCLEOD thought Officer [        ] TPD, a task force
officer was the seizing officer. [        ] LNU did the forensic            b6 -4
analysis of his computer.  On McCLEOD's computer is a notify list     b7C -4
which has the screen name of a man he was communicating with in
Yemen.  Over a period of 4-5 months, around the end of August 2000,
before McCLEOD's arrest in 2000 he communicated with this man on a
constant basis.  The man knew McCLEOD was a paralegal and the type
of work he did.  He man asked a lot of detailed questions regarding
surveillance, how they are conducted, how to spot one, counter
surveillance, places in the United States such as malls, airports,
and court buildings.  McCLEOD said he would find this man in the
MIRC chatroom, address www.mirc.com.  This chat room was run out of
South Africa.

McLeod-4



U.S. Department of Justice

Federal Bureau of Investigation

*Washington, D.C. 20535*

MAY 5, 2006

MR STEVEN A MCLEOD
**924820
MAIN UNIT
10650 SOUTHWEST 46TH STREET
JASPER, FL 32052

Subject: MCLEOD, STEVEN A

FOIPA No. 1029110- 001

Dear Requester:

       The enclosed documents were reviewed under the Freedom of Information/Privacy Acts (FOIPA), Title 5, United States Code, Section 552/552a. Deletions have been made to protect information which is exempt from disclosure, with the appropriate exemptions noted on the page next to the excision. In addition, a deleted page information sheet was inserted in the file to indicate where pages were withheld entirely. The exemptions used to withhold information are marked below and explained on the enclosed Form OPCA-16a:

| Section 552 | | Section 552a |
|---|---|---|
| ☐(b)(1) | ☐(b)(7)(A) | ☐(d)(5) |
| ☐(b)(2) | ☐(b)(7)(B) | ☒(j)(2) |
| ☐(b)(3)_____ | ☒(b)(7)(C) | ☐(k)(1) |
| _____ | ☐(b)(7)(D) | ☐(k)(2) |
| _____ | ☐(b)(7)(E) | ☐(k)(3) |
| _____ | ☐(b)(7)(F) | ☐(k)(4) |
| ☐(b)(4) | ☐(b)(8) | ☐(k)(5) |
| ☐(b)(5) | ☐(b)(9) | ☐(k)(6) |
| ☒(b)(6) | | ☐(k)(7) |

4 **page(s)** were reviewed and 4 **page(s)** are being released.

☐ Document(s) were located which originated with, or contained information concerning other Government agency(ies) [OGA]. This information has been:

   ☐ referred to the OGA for review and direct response to you.

   ☐ referred to the OGA for consultation. The FBI will correspond with you regarding this information when the consultation is finished.

☐ You have the right to appeal any denials in this release. Appeals should be directed in writing to the Co-Director, Office of Information and Privacy, U.S. Department of Justice,1425 New York Ave., NW, Suite 11050, Washington, D.C. 20530-0001 within sixty days from the date of this letter. The envelope and the letter should be clearly marked "Freedom of Information Appeal" or "Information Appeal." Please cite the FOIPA number assigned to your request so that it may be easily identified.

☐ The enclosed material is from the main investigative file(s) in which the subject(s) of your request was the focus of the investigation. Our search located additional references, in files relating to other individuals, or matters, which may or may not be about your subject(s). Our experience has shown, when ident, references usually contain information similar to the information processed in the main file(s). Because of our significant backlog, we have given priority to processing only the main investigative file(s).

If you want the references, you must submit a separate request for them in writing, and they will be reviewed at a later date, as time and resources permit.

☐ See additional information which follows.

Sincerely yours,

David M. Hardy
Section Chief
Record/Information
  Dissemination Section
Records Management Division

Enclosure(s)

Although the enclosed document does not appear to be responsive to your original Freedom of Information-Privacy Acts request, it is being released to you in connection with your letter dated April 4, 2006, addressed to Ann Shannon of our Jacksonville Field Office (JKFO). For your additional information, the file number written on your June 29, 2005, letter addressed to Agent Maricotti of our JKFO which you believe to be an investigation number is simply a control file which houses complaints such as your letter. There are no investigatory records maintained therein and only serial three of that file pertains to you.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEVEN A. McLEOD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 06-0247 (JDB) |
| | ) |
| U.S. DEPARTMENT OF JUSTICE, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)    I am currently the Section Chief of the Record/Information Dissemination Section

("RIDS"), Records Management Division ("RMD"), at Federal Bureau of Investigation

Headquarters ("FBIHQ") in Washington, D.C.  I have held this position since August 1, 2002.

Before joining the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate

General of the Navy for Civil Law.  In that capacity, I had direct oversight of Freedom of

Information  Act ("FOIA") policy, procedures, appeals, and litigation for the Navy.  From

October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and

routinely worked with FOIA matters.  I am also an attorney who has been licensed to practice law

in the State of Texas since 1980.

(2)    In my official capacity as Section Chief of RIDS, I supervise approximately 233

employees who staff a total of ten (10) units and a field operational service center unit whose

— Exhibit #2    —

collective mission is to effectively plan, develop, direct and manage responses to requests for access to FBI records and information pursuant to the FOIA; Privacy Act; Executive Order 12958, as amended; Presidential, Attorney General and FBI policies and procedures; judicial decisions and other Presidential and Congressional directives.  The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552 and the Privacy Act of 1974, 5 U.S.C. § 552a.  Specifically, I am aware of the treatment which has been afforded the FOIPA request of Steven A. McLeod.

(4)     The purpose of this declaration is to provide the Court and plaintiff with an explanation of the search for records responsive to plaintiff's request to FBIHQ that resulted in no records being located.    This declaration also provides a justification for the withholding of certain information from a release made to plaintiff by FBIHQ in accordance with Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), pursuant to Privacy Act Exemption (j)(2), 5 U.S.C. § 552a (j)(2) and FOIA Exemptions 6 and 7(C), U.S.C. § 552  (b)(6) and (b)(7)(C).[1]

**CORRESPONDENCE RELATED TO PLAINTIFF'S REQUEST**

(5)     By letter dated August 7, 2005, plaintiff submitted a FOIPA request to the FBI's Tampa Field Office ("TPFO") for "any information currently in your (FBI) possession of any

---

[1]See ¶¶ 15 and 17, infra.

-2-

evidence of criminal misconduct, exculpatory evidence or evidence planting or tampering by any persons involved in the case of the <u>State of Florida v. Steven A. McLeod, case no. 00-15913</u>."[2] (<u>See</u> Exhibit A.)

(6)    By letter dated August 19, 2005, FBIHQ advised plaintiff that his request did not contain sufficient information to conduct an accurate search of the Central Records System ("CRS") at FBIHQ. Plaintiff was advised to provide the necessary information before a search for responsive records could be made. Plaintiff's completed information form, which was returned to FBIHQ, was signed and dated August 29, 2005. (<u>See</u> Exhibit B.)[3]

(7)    By letter dated September 20, 2005, FBIHQ advised plaintiff that a search of the automated indices to the CRS at FBIHQ located no responsive records for his request, FOIPA number 1029110. Plaintiff was also advised that he could appeal the FBI's "no record" response by writing to the Office of Information and Privacy ("OIP") at the United States Department of Justice ("DOJ") within sixty days. (<u>See</u> Exhibit C.)

(8)    By letter dated October 3, 2005, plaintiff appealed the FBI's "no record" response to OIP stating, "this information exists and I am entitled to it." (<u>See</u> Exhibit D.)

---

[2]  Plaintiff sent his FOIPA request to the "FBI Public Corruption Squad" at TPFO and it was subsequently forwarded to FBIHQ for handling.

[3]Plaintiff also included his FBI identification number on the form. If plaintiff's intent is to obtain a copy of an FBI identification record or "rap sheet," he may do so by sending a written request to FBI, CJIS Division, Attn: SCU, Mod. D-2, 1000 Custer Hollow Road, Clarksburg, West Virginia 26306. Each request must include proof of identity which shall consist of name, date and place of birth and a set of rolled-ink fingerprint impressions placed upon fingerprint cards or forms commonly utilized for applicant or law enforcement purposes by law enforcement agencies, plus payment of $18.00 in the form of a certified check or money order, payable to the Treasury of the United States.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(9)    The Central Records System ("CRS"), which is utilized by the FBI to conduct

searches in response to FOIA and Privacy Act requests, enables it to maintain all information

which it has acquired in the course of fulfilling its mandated law enforcement responsibilities.

The records consist of administrative, applicant, criminal, personnel, and other files compiled for

law enforcement purposes. This system consists of a numerical sequence of files broken down

according to subject matter. The subject matter of a file may relate to an individual,

organization, company, publication, activity or foreign intelligence matter. Certain records in the

CRS are maintained at FBIHQ. Records that are pertinent to specific field offices are maintained

in those field offices.

(10)    Access to the CRS is obtained through the General Indices, which are arranged in

alphabetical order. The General Indices consist of index cards on various subject matters that are

searched either manually or through the automated indices. The entries in the General Indices

fall into two categories:

> (a)  A "main" entry - A "main" entry carries the name corresponding with a
> subject of a file contained in the CRS.

> (b)  A "reference" entry - "Reference" entries, sometimes called "cross-
> references," are generally only a mere mention or reference to an individual,
> organization, etc., contained in a document located in another "main" file.

(11)    Access to the CRS files at FBI field offices is also obtained through the General

Indices (automated and manual), which are likewise arranged in alphabetical order, and consist

of an index on various subjects, including the names of individuals and organizations. Searches

made in the General Indices to locate records concerning a particular subject, such as Steven

Alan McLeod, are made by searching the subject requested in the index. FBI field offices have automated indexing functions.

(12)    On October 16, 1995, the Automated Case Support ("ACS") was implemented for all Field Divisions, Legal Attaches ("Legats") and FBIHQ. Over 105 million records were converted from automated systems previously utilized by the FBI. ACS consists of three integrated, yet separately functional, automated applications that support case management functions for all FBI investigative and administrative cases, which are:

(a)    Investigative Case Management ("ICM") - ICM provides the ability to open, assign, and close investigative and administrative cases as well as set, assign and track leads. The Office of Origin ("OO"), which sets leads for itself and other divisions, as needed, opens a case. The field offices that receive leads from the OO are referred to as Lead Offices ("LOs"), formerly known as Auxiliary Offices. When a case is opened, it is assigned a Universal Case File Number ("UCFN"), which is utilized by FBIHQ and all offices that are conducting or assisting in the investigation. Using a fictitious file number "12-WF-1234" as an example, an explanation of the UCFN is set forth: "12" indicates the classification for the specific type of investigation. "WF" is the abbreviated form used for the Office of Origin of the investigation, which in this case is the FBI's Washington Metropolitan Field Office, and "1234" indicates the individual case file number for the particular classification of investigation.

(b)    Electronic Case File ("ECF") - ECF serves as the central electronic repository for the FBI's official text-based documents. ECF supports the universal serial concept, in that only the creator of a document serializes it into a file, providing single source entry of serials into

-5-

the computerized ECF system. All <u>original</u> serials are maintained in the OO case file.

   (c) Universal Index ("UNI") - UNI continues the universal concepts of ACS by providing a complete subject/case index to all investigative and administrative cases. Only the OO is required to index; however, the LOs may index additional information as needed. UNI, a 93.6 million record index, provides functions to index names to cases and to search names and cases for the FBI's investigative and administrative cases. Names of individuals or organizations are recorded with identifying information, such as sex, race, event date, date or place of birth, locality, Social Security number, or address.

   (13) The decision to index names other than subjects, suspects and victims is a discretionary decision made by the FBI Special Agent ("SA") assigned to work on the investigation, the supervisory SA ("SSA") in the field office conducting the investigation and the SSA at FBIHQ. The FBI does not index every name in its files; rather, it indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this enormous mass of information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter or individual, <u>i.e.</u>, Steven Alan McLeod.

-6-

## SEARCH FOR RESPONSIVE RECORDS

(14)    In response to plaintiff's request, FBIHQ searched the CRS using plaintiff's name

in order to locate any main investigatory files maintained at HQ.  A search of the CRS by using

the name "Steven Alan McLeod" would cover a six-way phonetic breakdown of the name

including any variations of the first and/or last name that sounds like or is spelled differently than

the name.  For example, this search would locate records using the phonetic sounds of each last

and first name relating to the following names: "McLeod, Steven A.," "McLeod, Steven," and

"McLeod, Steven Alan."  FBIHQ also used plaintiff's date of birth and Social Security number to

facilitate the identification of responsive records.  This search failed to locate any main

investigatory files responsive to plaintiff's request.

(15)    Upon receipt of the complaint in this litigation, the FBI noted that the original

request letter was addressed to TPFO, not FBIHQ.  Therefore, it was determined that the FBI

should search the TPFO indices of the CRS.  Second, the FBI expanded the search to include

cross-references responsive to plaintiff's request.  This second search failed to locate any

pertinent main files or cross-references at TPFO, regarding State of Florida v. Steven A.

McLeod, Case No. 00-15913.[4]  Also, the FBI Jacksonville Field Office (JKFO) searched the

JKFO indices because Mr. McLeod is, and has been incarcerated at a facility within the

geographic boundaries of that Field Office.  That search did not reveal any responsive

---

[4]  In the absence of a specific request for a search of cross-references at the administrative
level, the FBI's current policy is to search for and identify only "main" files responsive to FOIA
requests.  In this case, at the administrative level, plaintiff did not specifically request that a
search be conducted for cross-references.

documents. TPFO did locate three letters addressed to the FBI that Mr. McLeod had authored

requesting FBI investigative assistance in matters unrelated to his FOIA request. (Attached at

Exhibit E.) A copy of these letters with their attachments was mailed to Mr. McLeod on

March 31, 2006. In response to receipt of these letters Mr. McLeod wrote a letter stating that he

had given an interview to FBI agents on September 21, 2004 and claimed that documentation of

that interview related to his original FOIA request. (Attached at Exhibit F.) Located at TPFO

was a report of an interview of Mr. McLeod conducted by the FBI on September 21, 2004.[5] The

interview was conducted after Mr. McLeod alleged he had information about judicial corruption.

The only corruption information relayed by Mr. McLeod was allegations that he personally had

delivered cash bribes from defense attorneys to a judge, and that he had witnessed a bribe

delivered via a defense attorney to a male prosecutor in exchange for Mr. McLeod's friend to

receive a more lenient sentence. The interview summary did not contain any "evidence of

criminal misconduct, exculpatory evidence or evidence of planting or tampering by any persons

involved in the case of State of Florida v. Steven A. McLeod, Case No. 00-15913." None of the

named or described participants corresponded to those named or described in Plaintiff's

Complaint nor in Exhibits 8 and 13 attached to his complaints.

(16)    In accordance with the DOJ FOIA regulations, 28 C.F.R. Section 16.3(b), FOIA

requesters are put on constructive notice that it is incumbent upon them to describe the records

sought in enough detail to enable Department personnel to locate them with a reasonable

---

[5] The interview summary spelled the subject's name slightly differently than Steven A. McLeod, but other personal identifiers matched.

amount of effort. In accordance with the DOJ FOIA regulations, 28 C.F.R. Sections 16.3(a) and

16.41(a), FOIA requesters are placed on constructive notice that it is incumbent upon them to

direct their requests to those FBI field offices most likely to have records responsive to their

requests. In this instance, even though FBIHQ, TPFO and JKFO do not have any records

responsive to plaintiff's request, other FBI field offices may have such records. Pursuant to 28

C.F.R. Sections 16.3(a) and 16.41(a), plaintiff must direct his FOIA request to those FBI field

offices most likely to possess responsive records.

(17)    Although the FBI does not consider the September 21, 2004, interview of plaintiff

responsive to his original FOIPA request, based on his April 4, 2006, letter to Ann Shannon of

the FBI's JKFO, the interview was processed and released to him by FBI letter dated May 5,

2006, with redactions made pursuant to exemption (j)(2) of the Privacy Act and (b)(6) and

(b)(7)(C) of the FOIA. (See Exhibit G.)

**EXPLANATION OF FORMAT USED FOR THE**
**JUSTIFICATION OF DELETED MATERIAL**

(18)    All information was processed to achieve maximum disclosure consistent with the

access provisions of the FOIA. Every effort was made to provide plaintiff with all material in the

public domain and with all reasonably segregable portions of releasable material. To further

describe the information withheld could identify the material sought to be protected. Copies of

the vaughned pages are attached hereto as Exhibit G. Each page of Exhibit G is consecutively

numbered " McLeod-1 through McLeod-4 in the lower right margin. The exemptions asserted

-9-

by the FBI as grounds for non-disclosure of portions of documents, are Privacy Act Exemption (j)(2) and FOIA Exemptions 6 and 7(C).

(19)    Copies of the pages contain, on their face, coded categories of exemptions which detail the nature of the information withheld pursuant to the provisions of the FOIA. To further describe the information withheld in more detail could identify the very material that the FBI is protecting. No reasonably segregable, nonexempt portions were withheld from plaintiff. The coded categories are provided to aid the Court's review of the FBI's explanations of FOIA exemptions used to withhold the protected material. Accordingly, a review of this information will reveal that all material withheld is exempt from disclosure pursuant to a FOIA exemption or it is so intertwined with protected material that segregation is not possible without revealing the underlying protected material.

## MECHANICS OF USING THE CODED FORMAT
## WITH THE EXEMPTION CATEGORIES

(20)    The coded format is used in this case to assist the Court and plaintiff in reviewing the information withheld within the context of the material itself. Each instance of information withheld pursuant to the FOIA on the attached document is accompanied by a coded designation that corresponds to the categories listed below. For example, if "(b)(7)(C)-1" appears on the document, the "(b)(7)(C)" designation refers to "Exemption (b)(7)(C)" of the FOIA concerning "Unwarranted Invasion of Privacy." The numerical designation "1" following the "(b)(7)(C)" narrows the main category to the more specific subcategory, "Names of FBI Agents." Listed below are the categories used to explain the FOIA exemptions asserted to withhold this material:

## SUMMARY OF JUSTIFICATION CATEGORIES

| **Category (b)(6)** | **Clearly Unwarranted Invasion of Personal Privacy** |
| --- | --- |
| (b)(6)-1 | Names of FBI Special Agents (Cited in conjunction with (b)(7)(C)-1) |
| (b)(6)-2 | Names and/or Identifying Information on Third Parties Merely Mentioned (Cited in conjunction with (b)(7)(C)-2) |
| (b)(6)-3 | Names and/or Identifying Information on Third Parties of Possible Investigative Interest (Cited in conjunction with (b)(7)(C)-3) |
| (b)(6)-4 | Names of Non-FBI Law Enforcement Personnel (Cited in conjunction with (b)(7)(C)-4) |

| **Category (b)(7)(C)** | **Unwarranted Invasion of Personal Privacy** |
| --- | --- |
| (b)(7)(C)-1 | Names of FBI Special Agents. (Cited in conjunction with (b)(6)-1) |
| (b)(7)(C)-2 | Names and/or Identifying Information on Third Parties Merely Mentioned (Cited in conjunction with (b)(6)-2) |
| (b)(7)(C)-3 | Names and/or Identifying Information on Third Parties of Possible Investigative Interest (Cited in conjunction with (b)(6)-3) |
| (b)(7)(C)-4 | Names of Non-FBI Law Enforcement Personnel (Cited in conjunction with (b)(6)-4) |

## JUSTIFICATION FOR REDACTIONS

(21)     Paragraphs 22-42 infra, explain the FBI's rationale for withholding each particular category of information under the specific exemption categories described above.

## PRIVACY ACT EXEMPTION (j)(2)

(22)     Section (j)(2) of the Privacy Act exempts from mandatory disclosure systems of records "maintained by an agency or component thereof which performs as its principal

-11-

function any activity pertaining to the enforcement of criminal laws, including police efforts to prevent, control, or reduce crime or to apprehend criminals . . . ."

(23)     The information provided by plaintiff during a September 21, 2004, interview was recorded as a result of plaintiff alleging to have knowledge of "22 cases since 1995 that were fixed involving 4 judges, 6 prosecutors and about the same number of attorneys" at the same time that the TPFO was conducting an FBI investigation into law enforcement corruption in the Hillsborough County Courthouse at Tampa, Florida. Accordingly, these files are exempt from disclosure pursuant to 5 U.S.C. § 552a (j)(2) of the Privacy Act, in conjunction with 28 C.F.R. § 16.96. Although access to the record was denied under the Privacy Act, the document responsive to plaintiff's request was processed under the access provisions of the FOIA to achieve maximum disclosure.

## EXEMPTION (b)(6)
## CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY

(24)     5 U.S.C. § 552 (b)(6) exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."

(25)     When withholding information pursuant to this exemption, the FBI is required to balance the privacy interests of the individuals mentioned in the documents against any public interest in disclosure. In asserting this exemption, each piece of information was examined to determine the degree and nature of the privacy interest of any individual whose name and/or identifying information appears in the document at issue. The public interest in disclosure of the information is determined by whether the information in question would inform plaintiff or the

-12-

general public about the FBI's performance of its mission to enforce federal criminal and

national security statutes, and/or how the FBI actually conducts its internal operations and

investigations. As explained below, there is no legitimate public interest in the information that

has been withheld pursuant to Exemption (b)(6).

### (b)(6)-1        Names of FBI Special Agents

(26)    Exemption (b)(6)-1 has been asserted in conjunction with Exemption (b)(7)(C)-1

to protect the names of the two FBI Special Agents (SAs) from the JKFO who were responsible

for interviewing plaintiff. FBI SAs from TPFO who were responsible for conducting,

supervising, and/or maintaining the investigation into corruption in Hillsborough County

requested the interview of plaintiff. The responsibilities also included interviewing cooperating

witnesses and sources, and reviewing materials compiled as a result of the investigation of

corruption in Hillsborough County. Assignments of SAs to any particular investigation are not

by choice. Publicity (adverse or otherwise) regarding any particular investigation to which they

have been assigned may seriously prejudice their effectiveness in conducting other

investigations. The privacy consideration is also to protect FBI SAs as individuals from

unnecessary, unofficial questioning as to the conduct of this or other investigations, whether or

not they are currently employed by the FBI. FBI SAs conduct official inquiries into various

criminal and national security violation cases. SAs come into contact with all strata of society,

conducting searches and making arrests, both of which result in reasonable but nonetheless

serious disturbances to people and their lives. It is possible for an individual targeted by such

law enforcement actions to carry a grudge which may last for years. These individuals may seek

-13-

revenge on the FBI SAs involved in a particular investigation. The publicity associated with the

release of the identity of an FBI SA in connection with a particular investigation could trigger

hostility toward that particular individual. Accordingly, these individuals maintain substantial

privacy interests in not having their identities disclosed. In considering the public interest in this

information, the FBI determined that there is no public interest to be served by releasing the

identities of these SAs because this information does not shed light on the operations and

activities of the FBI. Any such disclosure would constitute a clearly unwarranted invasion of

their personal privacy.

(27)    In balancing the substantial privacy interest of these individuals against no

legitimate public interest in its disclosure, the FBI has determined that this information regarding

FBI SAs has been properly withheld pursuant to Exemption 6. Exemption (b)(6)-1 in

conjunction with (b)(7)(C)-1 is invoked on the following page: McLeod 1.

### (b)(6)-2    Names and/or Identifying Information of Third Parties Merely Mentioned

(28)    Exemption (b)(6)-2 has been asserted in conjunction with Exemption (b)(7)(C)-2

to withhold the names and identifying information of third parties merely mentioned in the

interview of plaintiff. Identifying information includes the individuals' relationship to plaintiff,

as well allegations that plaintiff made against these individuals who were not of investigative

interest to the FBI. These third parties maintain legitimate privacy interest in not having this

information disclosed. If the FBI disclosed their names and other personal information, the

disclosure would reveal that these third parties were possibly connected with the FBI's

investigation of corruption in Hillsborough County. Disclosure of these third parties' names and

-14-

identifying information in connection with the FBI's investigation could carry an extremely negative connotation. Disclosure of their identities could subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them. Accordingly, the FBI determined that these third parties maintained a substantial privacy interest in not having information about them disclosed. In considering the public interest in this information, the FBI determined that there is no public interest to be served by releasing the identities of these third parties merely mentioned because this information would not shed light on the operations and activities of the FBI. Any such disclosure would constitute a clearly unwarranted invasion of their personal privacy.

(29)     In balancing the substantial privacy interest that these individuals have in this information against no legitimate public interest in its disclosure, the FBI has determined that this information regarding third parties merely mentioned has been properly withheld pursuant to Exemption 6. Exemption (b)(6)-2 in conjunction with Exemption (b)(7)(C)-2 is invoked on the following pages: McLeod 1, 2 and 3.

### (b)(6)-3      Names and/or Identifying Information on Third Parties of Possible Investigative Interest

(30)     Exemption (b)(6)-3 has been asserted in conjunction with Exemption (b)(7)(C)-3 to withhold the names and identifying information of third parties who were of possible investigative interest to the FBI and/or local law enforcement. During the course of the FBI's interview of plaintiff he made criminal allegations about associates who may or may not have been investigated by the FBI and/or local law enforcement. Consequently, due to the criminal allegations against these individuals, disclosure of their identities could subject them to

-15-

harassment, embarrassment and could cause undue public attention. Furthermore, disclosure of

their identities could threaten their physical safety. Accordingly, the FBI has determined that

these individuals maintain a substantial privacy interest in not having their identities disclosed.

In considering the public interest in this information, the FBI determined that there is no public

interest to be served by releasing the identities of these third parties of possible investigative

interest by the FBI and/or local law enforcement because this information would not shed light

on the operations and activities of the FBI. Any such disclosure would constitute a clearly

unwarranted invasion of their personal privacy.

(31)    In balancing the substantial privacy interest that these individuals have in this

information against no legitimate public interest in its disclosure, the FBI has determined that

this information regarding these third parties has been properly withheld pursuant to Exemption

6. Exemption (b)(6)-3 in conjunction with Exemption (b)(7)(C)-3 is invoked on the following

pages: McLeod 1, 2 and 3.

### (b)(6)-4    Names of Non-FBI Law Enforcement Personnel

(32)    Exemption (b)(6)-4 has been asserted in conjunction with (b)(7)(C)-4 to withhold

the names of two non-FBI law enforcement personnel who plaintiff alleges in the interview were

Tampa Police Department officers who seized his computer and did forensic analysis of the

computer. Disclosure of these two individuals' identities could jeopardize their effectiveness in

the performance of their official duties. There is no public interest to be served by releasing this

information. Exemption (b)(6)-4 in conjunction with (b)(7)(C)-4 is invoked on the following

page: McLeod 4.

-16-

## EXEMPTION 7
## EXEMPTION 7 THRESHOLD

(33)    Exemption 7 of the FOIA protects from mandatory disclosure records or information compiled for law enforcement purposes, but only to the extent that disclosure could reasonably be expected to cause one of the harms enumerated in the subpart of the exemption. See 5 U.S.C. § 552 (b)(7). In this case, the harm that could reasonably be expected to result from disclosure concerns invasion of personal privacy.

(34)    Before an agency can invoke any of the harms enumerated in Exemption 7, it must first demonstrate that the records or information at issue were compiled for law enforcement purposes. Law enforcement agencies such as the FBI must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duty of that agency. The information provided by plaintiff during a September 21, 2004, interview was recorded as a result of plaintiff alleging to have knowledge of "22 cases since 1995 that were fixed involving 4 judges, 6 prosecutors and about the same number of attorneys" at the same time that the TPFO was conducting an FBI investigation into law enforcement corruption in the Hillsborough County Courthouse at Tampa, Florida. Accordingly, the information readily meets the threshold requirement of Exemption 7. The remaining inquiry is whether its disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy."

## EXEMPTION (b)(7)(C)
## UNWARRANTED INVASION OF PERSONAL PRIVACY

(35)    5 U.S.C. § 552 (b)(7)(C) exempts from disclosure:

> records or information compiled for law enforcement purposes, but only to the
> extent that the production of such law enforcement records or information . . .
> could reasonably be expected to constitute an unwarranted invasion of personal
> privacy.

(36)    When withholding information pursuant to this exemption, the FBI is required to
balance the privacy interests of the individuals mentioned in the documents against any public
interest in disclosure. In asserting this exemption, each piece of information was examined to
determine the degree and nature of the privacy interest of each individual whose name and/or
identifying information appears in the document at issue. The public interest in disclosure of the
information is determined by whether the information in question would inform plaintiff or the
general public about the FBI's performance of its mission to enforce federal criminal and
national security statutes, and/or how the FBI actually conducts its internal operations and
investigations. As explained below, there is no legitimate public interest in the information that
has been withheld pursuant to Exemption (b)(7)(C).

### (b)(7)(C)-1    Names of FBI Special Agents

(37)    Exemption (b)(7)(C)-1 has been asserted in conjunction with Exemption
(b)(6)-1 to protect the names of the two FBI Special Agents (SAs) from the JKFO who were
responsible for interviewing plaintiff. FBI SAs from TPFO who were responsible for
conducting, supervising, and/or maintaining the investigation into corruption in Hillsborough
County requested the interview of plaintiff. The responsibilities also included interviewing

-18-

cooperating witnesses and sources, and reviewing materials compiled as a result of the investigation of corruption in Hillsborough County. Assignments of SAs to any particular investigation are not by choice. Publicity (adverse or otherwise) regarding any particular investigation to which they have been assigned may seriously prejudice their effectiveness in conducting other investigations. The privacy consideration is also to protect FBI SAs as individuals from unnecessary, unofficial questioning as to the conduct of this or other investigations, whether or not they are currently employed by the FBI. FBI SAs conduct official inquiries into various criminal and national security violation cases. SAs come into contact with all strata of society, conducting searches and making arrests, both of which result in reasonable but nonetheless serious disturbances to people and their lives. It is possible for an individual targeted by such law enforcement actions to carry a grudge which may last for years. These individuals may seek revenge on the FBI SAs involved in a particular investigation. The publicity associated with the release of the identity of an FBI SA in connection with a particular investigation could trigger hostility toward that particular individual. Accordingly, these individuals maintain substantial privacy interests in not having their identities disclosed. In considering the public interest in this information, the FBI determined that there is no public interest to be served by releasing the identities of these SAs because this information does not shed light on the operations and activities of the FBI. Any such disclosure could constitute an unwarranted invasion of their personal privacy.

(38)    In balancing the substantial privacy interest of these individuals against no legitimate public interest in its disclosure, the FBI has determined that this information regarding

FBI SAs has been properly withheld pursuant to Exemption (b)(7)(C). Exemption (b)(7)(C)-1 in conjunction with Exemption (b)(6)-1 is invoked on the following pages: McLeod 1.

### (b)(7)(C)-2    Names and/or Identifying Information of Third Parties Merely Mentioned

(39)    Exemption (b)(7)(C)-2 has been asserted in conjunction with Exemption (b)(6)-2 to withhold the names and identifying information of third parties merely mentioned in the interview of plaintiff. Identifying information includes the individuals' relationship to plaintiff, as well allegations that plaintiff made against these individuals who were not of investigative interest to the FBI. These third parties maintain legitimate privacy interest in not having this information disclosed. If the FBI disclosed their names and other personal information, the disclosure would reveal that these third parties were possibly connected with the FBI's investigation of corruption in Hillsborough County. Disclosure of these third parties' names and identifying information in connection with the FBI's investigation could carry an extremely negative connotation. Disclosure of their identities could subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them. Accordingly, the FBI determined that these third parties maintained a substantial privacy interest in not having information about them disclosed. In considering the public interest in this information, the FBI determined that there is no public interest to be served by releasing the identities of these third parties merely mentioned because this information would not shed light on the operations and activities of the FBI. Any such disclosure could constitute an unwarranted invasion of their personal privacy.

-20-

(40)    In balancing the substantial privacy interest that these individuals have in this information against no legitimate public interest in its disclosure, the FBI therefore has determined that this information regarding third parties merely mentioned has been properly withheld pursuant to Exemption (b)(7)(C). Exemption (b)(7)(C)-3 in conjunction with Exemption (b)(6)-3 is invoked on the following pages: McLeod 1, 2 and 3.

### (b)(7)(C)-3    Names and/or Identifying Information of Third Parties of Possible Investigative Interest

(41)    Exemption (b)(7)(C)-3 has been asserted in conjunction with Exemption (b)(7)(C)-3 to withhold the names and identifying information of third parties who were of possible investigative interest to the FBI and/or local law enforcement. During the course of the FBI's interview of plaintiff he made criminal allegations about associates who may or may not have been investigated by the FBI and/or local law enforcement. Consequently, due to criminal allegations against these individuals, disclosure of their identities could subject them to harassment, embarrassment and could cause undue public attention. Furthermore, disclosure of their identities could threaten their physical safety. Accordingly, the FBI has determined that these individuals maintain a substantial privacy interest in not having their identities disclosed. In considering the public interest in this information, the FBI determined that there is no public interest to be served by releasing the identities of these third parties of possible investigative interest by the FBI and/or local law enforcement because this information would not shed light on the operations and activities of the FBI. Any such disclosure could constitute an unwarranted invasion of their personal privacy.

-21-

(42)   In balancing the substantial privacy interest that these individuals have in this information against no legitimate public interest in its disclosure, the FBI has determined that this information regarding these third parties has been properly withheld pursuant to Exemption (b)(7)(C). Exemption (b)(7)(C)-3 in conjunction with Exemption (b)(6)-3 is invoked on the following pages: McLeod 1, 2 and 3.

### (b)(7)(C)-4    Names and/or identifying information of Non FBI Law Enforcement Personnel

(43)   Exemption (b)(7)(C)-4 has been asserted in conjunction with (b)(6)-4 to withhold the names of two non-FBI law enforcement personnel who plaintiff alleges in the interview were Tampa Police Department officers who seized his computer and did forensic analysis of the computer. Disclosure of these two individuals' identities could jeopardize their effectiveness in the performance of their official duties. There is no public interest to be served by releasing this information. Exemption (b)(7)(C)-4 in conjunction with (b)(6)-4 is invoked on the following page: McLeod 4.

### CONCLUSION

(44)   Plaintiff has been provided one document that he referenced in an April 4, 2006, letter to the JKFO. Although the FBI does not consider the document responsive to his FOIPA request, it has been provided to him in redacted form. The document was individually reviewed for segregability. All segregable information has been released to plaintiff, and no reasonably segregable portion of the withheld material can be released. As demonstrated above, the only information withheld by the FBI consists of information that would infringe upon the personal privacy of third party individuals. This information cannot be further segregated without

-22-

revealing the protected information itself.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the foregoing

is true and correct, and that Exhibits A through G attached hereto are true and correct copies.

Executed this _____ 16th _____ day of May, 2006.

DAVID M. HARDY
Section Chief
Record/Information Dissemination
Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

August 7th, 2005

Steven A. McLeod D.C.# 924820
Hamilton C.I. (Main Unit)
10650 S.W. 46th St
Jasper, FL 32052

F.B.I. Public Corruption Squad
500 E. Zack St., Suite 610
Tampa, FL 33602

Public Corruption Squad,

    This letter is my official request pursuant to the federal Freedom Of Information Act (FOIA) for any information currently in your possession of any evidence of criminal misconduct, exculpatory evidence or evidence planting or tampering by any persons involved in the case of State of Florida v. Steven A. McLeod, Case No. 00-15913 13th Judicial Circuit Court In And For Hillsborough County, Florida. Please respond to this request within the applicable time period under federal law. Thank you and God bless.

                                    Sincerely,

cc: file

— Exhibit #3

EXHIBIT A



U.S. Depart    f Justice

Executive Office for United States Attorneys
Freedom of Information/Privacy Act Unit
600 E Street, N.W., Room 7300
Washington, D.C. 20530
202-616-6757  Fax 202-616-6478

JAN 17 2006

Requester: STEVEN A. MCLEOD _____  Request Number: 05-3441

Subject of Request: SELF _____

Dear Requester:

    Your recent request for records from the Executive Office for United States Attorneys (EOUSA) has been received. Before the Executive Office can begin processing your request, it is necessary for you to correct one or more deficiencies. Please comply with the paragraphs checked below:

1.  [X] A requester must provide a notarized example of his/her signature or a certification of identity under penalty of perjury. This insures that information pertaining to an individual is released only to that person. A form is enclosed for your use.

2.  [ ] The files and records of United States Attorneys are maintained in over one hundred separate offices throughout the United States. Please identify the specific United States Attorney's office(s) where you believe records may be located. This would be primarily the district(s) in which a prosecution or litigation occurred.

3.  [ ] To insure that records are properly identified, provide subject's full name, current address, and date and place of birth.

4.  [ ] A request must describe the records sought in sufficient detail to allow location of the records with a reasonable amount of effort (i.e., processing the request should not require an unduly burdensome effort or be disruptive of Department operations). Please provide more specific information about the records you seek, such as appropriate dates, locations, names, nature of the records, etc.

    By making a FOIA/PA request, you agree to pay fees up to $25, as stated in 28 C.F.R. §16.3(c), unless you request a waiver of fees (according to requirements in 28 C.F.R. §16.11(k)). Indigency does not constitute a basis for a fee waiver. Please note that pursuant to 28 C.F.R. §16.11, we are required to charge fees for time used to search for the documents you have requested and for duplication of all pages released to you. Normally, search time is charged at a rate of $28 per hour after the first

(Page 1 of 2)
Form No. 003 - 9/01

— Exhibit #4




two hours which are free, and duplication fees are $0.10 per page after the first 100 pages which are free. Please do not send any payment at this time! If we anticipate that fees will exceed $25 or the amount you state in your letter (if greater than $25), we will normally notify you of our estimate of fees. After we have received your agreement to pay for the expected fees (or you have narrowed your request to reduce fees) and we have processed your request, we will require payment for the accumulated charges before we release any documents to you (in excess of 100 free pages). Without such payment, your request file will be closed without further action.

Once you have corrected the above deficiencies, please submit a new request for the documents. This is a final determination and your request has been closed. When we have received your new, corrected request, we will open a new file for you. **Please send your new, corrected request to the address above.**

You may appeal my decision in this matter by writing within sixty (60) days from the date of this letter, to:

Office of Information and Privacy
United States Department of Justice
Flag Building, Suite 570
Washington, D.C.  20530

Both the envelope and the letter of appeal must be clearly marked "Freedom of Information Act/Privacy Act Appeal."

After the appeal has been decided, you may have judicial review by filing a complaint in the United States District Court for the judicial district in which you reside or have your principal place of business; the judicial district in which the requested records, if any, are located; or in the District of Columbia.

Sincerely,

Marie A. O'Rourke

Marie A. O'Rourke
Assistant Director

[X] Enclosure(s)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


STEVEN A. MCLEOD
        Plaintiff,                                  CIVIL ACTION NO: 06-247 (JDB)

v.

U.S. DEPARTMENT OF JUSTICE, et al..
        Defendants.
_____/


## ORDER

THIS CAUSE, having come before this Court, pursuant to the Plaintiff's Motion
for In Camera Production of Records, it is hereby **ORDERED and ADJUDGED:**

1. Defendants F.B.I. Public Corruption Squad in Tampa, Florida Shall turn over
   any and all documents, records and other information, including but not limit
   to, the names and identity's of any cooperating witness, in the investigation of
   corruption in the Hillsborough County Courthouse in Tampa, Florida, to this
   Court within thirty (30) days of the date of this order for in camera inspection.

2. Defendants U.S. Attorney's Office in Tampa, Florida shall turn over any and
   all documents, including but not limited to grand jury proceeding transcripts,
   in respect to the F.B.I. Public Corruption Squad investigation in Tampa,
   Florida into corruption in the Hillsborough County Courthouse in Tampa,
   Florida, to this Court within thirty (30) days of the date of this Order for in
   camera inspection.

**DONE AND ORDERED** in chambers on this ___ day of _____, 2006.


_____
John D. Bates, U.S. District Judge